**HOLFORD USA LTD., INC., Plaintiff,**

v.

**CHEROKEE, INC., Defendant.**

No. 94 Civ. 6112 (LAK).

United States District Court, S.D. New York.

Oct. 11, 1994.

Leonard Benowich, Zivyak Klein & Liss, New York City, for plaintiff.

Fredric J. Zepp, Marco Materassi, Latham & Watkins, New York City, for defendant.

### AMENDED OPINION

KAPLAN, District Judge.

This is a motion by plaintiff Holford USA Ltd., Inc. ("Holford"), an importer and supplier of wearing apparel, for a preliminary injunction pending arbitration of a contractual dispute with its customer, Cherokee, Inc. ("Cherokee"), a firm engaged in the business of designing, marketing and selling wearing apparel and evidently the owner of the well-known CHEROKEE trademark used on jeans. Holford contracted with Cherokee for the manufacture and sale of a large quantity of five pocket denim jeans of a specific weight ("Jeans") and obtained a right of first refusal with respect to Cherokee's future requirements of Jeans. It claims in essence that Cherokee has (a) failed to pay in full for the Jeans it has accepted, (b) wrongfully refused to take delivery of and pay for other Jeans it allegedly was obligated to buy, and (c) contracted with others for the supply of Jeans in derogation of Holford's right of first refusal. Holford seeks a preliminary injunction restraining Cherokee from (a) contracting for, purchasing or taking delivery of Jeans from, and (b) interfering with Holford's efforts to sell Jeans to, others. Before proceeding to a detailed consideration of the evidence and the parties' contentions, it is useful to place this dispute in its practical business context.

In December 1993, Holford and Cherokee entered into a contract, known in the trade as a replenishing inventory arrangement, pursuant to which Holford agreed to manufacture Jeans for Cherokee. The specific product in question was a new line for Cherokee and, Cherokee claims, it would not have introduced the product but for the Holford arrangement. The attraction of the deal to Cherokee was that Holford would finance the manufacture of the Jeans, as Cherokee was not obligated to put up any money until after it took delivery, which it evidently hoped and expected would be only upon its own receipt of orders from its own customers. Holford, on the other hand, received a right of first refusal on the sale of Jeans to Cherokee and, it thought, an assured market for its product at favorable prices.

The Jeans were favorably received, and Cherokee began receiving substantial customer orders, apparently for the back-to-school season,[1] before Holford delivered sig-

1. Cherokee and Holford seem to divide the year into three retail selling seasons: the spring sea-

nificant quantities. Holford pressed its advantage, demanding as a condition of further production that Cherokee post a letter of credit, something to which Holford was not entitled under the original contract. Moreover, there is some evidence that Holford was not as quick in delivering finished product as it initially projected.

Cherokee began to have second thoughts about the wisdom of being solely dependent upon Holford for the Jeans. While the precise reason is disputed, it sought out other suppliers no later than March 1994, even before Holford was to have made substantial deliveries. Cherokee did not afford Holford the opportunity to match the price, terms and quantity of the Jeans it ordered from other suppliers.

By the summer of 1994, the Holford–Cherokee relationship was in shambles. Cherokee, by then in financial difficulty, had failed to pay Holford for substantial quantities of goods on which it had taken delivery. Holford had a good deal of capital tied up in additional Jeans, both completed and in production, for which Cherokee either declined to issue or purported to cancel purchase orders. And Cherokee was buying Jeans from other suppliers, claiming that Holford had breached its alleged obligation to make timely deliveries, which is hotly disputed by Holford. Indeed, Cherokee acknowledges that it has sourced its entire requirements for the holiday 1994 and spring 1995 seasons from suppliers other than Holford.

The reality of this motion therefore is evident. Holford wants its money and wants to sell the Jeans it has on hand, either to Cherokee or to someone else. Cherokee is unwilling to pay Holford what it owes, preferring to use its scarce cash resources to buy new merchandise C.O.D. And it objects to Holford turning its inventory into cash by selling Jeans, which of course bear a Cherokee label and trademark, to others because that allegedly would result in the discounting of Cherokee brand jeans and take sales away from Cherokee. So Holford, itself in a bind, wants the Court either to (a) cut Cherokee off from any source of supply of Jeans other than Holford or, alternatively, (b) prevent Cherokee from interfering with Holford's sale of Cherokee brand Jeans to other distribution channels. Holford's objective in seeking this broad preliminary injunction therefore seems to be to put Cherokee in a position in which it is forced to agree to a resolution favorable to Holford, a resolution presumably including payment of Holford.

Cherokee, for its part, is no more charitable. Anxious to conserve its cash and, perhaps, to extract a pound of flesh for what it regards as Holford's previous hardball tactics, Cherokee asserts that Holford should wait in line for payment for past deliveries like Cherokee's other trade creditors. And it would have Holford hold its inventory of Cherokee brand Jeans indefinitely while Cherokee decides whether to purchase any of it, which it apparently is willing to do to the extent it in turn obtains purchase commitments from retailers. Thus, in seeking denial of Holford's application, Cherokee evidently would put Holford to the choice of (a) sitting in its currently overextended position, or (b) negotiating a deal favorable to Cherokee.

Each side claims the moral high ground, arguing that the allegedly inappropriate behavior of the other should be weighed against it in any balancing of the equities.

In my view, Holford has shown a threat of irreparable injury, albeit not as extensive a threat as it claims. After considering the likelihood of success on the merits and the balance of the equities, I grant the motion in part and deny it in part.

---

son, January through April; the back to school season, May through August; and the holiday season, September through December. (Zane Supp.Aff. ¶¶ 31, 33–35 and Ex. O; Elles Aff. ¶ 12) Cherokee apparently buys jeans for these retail selling periods several months before the retailers need them. (Zane Supp.Aff. ¶¶ 45–49; Elles Aff. ¶ 12) Under this contract, for example, Cherokee was supposed to arrange for the delivery of new jeans four months ahead of when they were needed in the stores. (Zane Aff.Ex. A ¶ 9) Of course, the purchase of jeans by the wholesaler with the intent of selling them in a particular season does not prevent them from being held over into the next season, which is evidently what Cherokee has done this year. (Zane Supp. Aff. ¶ 34; Tr. Sept. 22, 1994, 4:15–21, 6–7:3–7)

*Facts*

The issues on this motion are whether Cherokee should be enjoined from (a) continuing its purchases of Jeans from other suppliers and, for that matter, from taking delivery of Jeans already ordered from them, or (b) from interfering with any effort that Holford might make to sell Jeans, the delivery of which Cherokee has not taken, to other distribution channels. Thus, the central factual concerns bearing on the merits are whether Cherokee is likely to breach the right of first refusal in the future, which implicates the question whether it has done so in the past, and whether the circumstances permit Holford to dispose of its Cherokee inventory to others. In addition, Cherokee's financial condition bears on the question of irreparable injury and the balance of the equities. I confine my consideration of the facts to these concerns, simply noting that it is undisputed that Cherokee owes Holford and its factor hundreds of thousand of dollars and thus stands in breach of the contract in at least this respect. (Transcript ("Tr."), Aug. 30, 1994, 36:15–17)[2]

*The Right of First Refusal*

The aspects of the December 8, 1993 contract (Zane Aff. Ex. A) pertinent to the first refusal claim are three:

1. Cherokee granted Holford "the right of first refusal, based on price, quantity and terms, to supply" Jeans to Cherokee. It recited that this right was granted by Cherokee to assure Holford of "a steady market for the Apparel." (*Id.* ¶ 11)

2. The contract contained no delivery times or schedule.

3. The contract was for a term of five years, but terminable by either party on 180 days notice. (*Id.* ¶ 16)

It is undisputed that the contract has not been terminated by either party and that Cherokee has purchased Jeans from other suppliers without giving Holford a right of first refusal with respect to those purchases (Zane Aff. ¶ 28).

Cherokee makes two arguments in defense of its purchase of Jeans without affording Holford its right of first refusal. First, it claims that its performance was excused by Holford's alleged delivery delays which, Cherokee argues, constituted material breaches of the contract by Holford. Second, it contends that it notified Holford of its intention to use other suppliers in February 1994 and that Holford acquiesced.

*The Alleged Delivery Delays*

Inasmuch as the December 1993 contract was silent as to the time for delivery, I must examine the course of dealings.

Cherokee begins by asserting that Holford initially provided delivery schedules indicating that it would deliver Jeans for Cherokee's back-to-school product line "as early as March" 1994, but that it did not meet that schedule. (Elles Supp.Aff. ¶ 2)

On February 24, 1994, Cherokee wrote to Holford.[3] The letter, which is significant for other purposes as well, noted among other things that the initial agreement provided for the purchase by Cherokee of 534,000 units, which were to be delivered in the period February 15 through May 31, 1994 and were intended to permit Cherokee to respond quickly to customer orders. It went on to state that the schedule had been changed as a result of "holidays, patterns, jet blue dye

---

**2.** There was no evidentiary hearing on this motion. When this motion first was filed, Holford made a minimal showing on the papers, assuming that a hearing would be held. The Court gave the parties leave to submit further briefs and affidavits in order to assess the need for a hearing on a full showing. Both parties have made extensive supplementary submissions and neither thereafter sought a hearing. Inasmuch as there are no essential facts in dispute and the parties are content to rest on their affidavits, no hearing is required. *See Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir.), *amended*, 890 F.2d 569 (2d Cir.), *cert.*

*dismissed*, 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989) (hearing unnecessary when there are no essential facts in dispute, or when the parties are content to rest on the affidavits).

**3.** The letter was addressed to Mr. Wu of Maxcan Apparel, a Hong Kong affiliate of Holford. (Elles Aff. ¶ 13 and Ex. D) The parties have treated Holford and Maxcan as alter egos of one another in presenting this matter, and I do so as well. References to Holford in this opinion therefore include references to Maxcan.

color, etc." to provide for delivery of 50% of the order in each of May and June 1994. (Elles Aff. Ex. D at 1–2) While the letter expressed concern about Holford's ability to deliver *additional* orders on time,[4] it did not express much if any dissatisfaction with the change in the delivery schedule for the initial 534,000 units. (*Id.* at 2)

On March 10, 1994, at a meeting in Hong Kong, the parties reached an additional agreement, changing in some respects the arrangements contracted in December. Cherokee agreed to take immediate possession of the first 534,000 unit order upon the goods being completed and made available to Cherokee, with payment to be in accordance with the original contract. (Zane Aff. Ex. D, ¶ 1) Cherokee agreed as well to pay a 25% deposit on a second tranche of 266,000 units when those goods were received in Holford's Los Angeles warehouse, the balance to be paid as the goods were transferred to Cherokee on an as needed basis. Cherokee agreed in any case to take possession of the second tranche within 120 days after completion and receipt of the goods in Los Angeles. (*Id.* ¶ 2) In addition, the parties discussed possible additional purchases of as many as 221,000 units. It was agreed that Cherokee would buy those units only if it needed them, but Cherokee agreed also that it would pay Holford for any fabric already purchased for their manufacture. (*Id.* ¶ 3)

At the same time, Holford committed to a schedule calling for delivery of 80,000 units in May, 315,600 units in June and 354,400 units in July. (Elles Aff. ¶ 4 and Ex. B at 2)[5] These three deliveries included both the initial order and most of the second tranche of 266,000 units. The agreement expressly stated that "[Holford] commits to the following delivering schedule. All of the quantities shown are for availability to transfer from [Holford] to Cherokee's warehouse no later than the 20th of each respective month." (*Id.* ¶ 5)

As far as the record discloses, matters proceeded without much difficulty for a number of months. While some faxes were exchanged concerning delivery times, and some changes were made in the schedule, there is no substantial evidence of any significant problem before early July.[6] (Zane Supp.Aff. ¶¶ 11–19 and Exs. F–K; *see* Elles Supp.Aff. ¶ 5) But on July 5, 1994, Cherokee began complaining vigorously of alleged prospective delays ranging from three days to five weeks in delivery of Jeans scheduled for receipt on or after July 20 and purported to cancel orders. (Elles Supp.Aff. ¶¶ 5–11 and Exs. F–J) By the time this motion was submitted, it was undisputed that at least 70,000 units due by July 20 had not been delivered by early September. (*Id.* ¶ 5)

Cherokee argues that Holford's delays were very damaging, asserting, without contradiction, that retailers may cancel orders that are even a day late and that Cherokee lost some sales as a result of Holford's delays. It has offered little evidence of retailer cancellations, however. Holford, for its part, claims that Cherokee's July correspondence concerning delays was pretextual, that many of the delays were trivial, and that it could have met the planned delivery dates if only Cherokee had asked.[7] (Zane Supp.Aff. ¶¶ 23–28)

---

4. As noted in more detail below, the letter spoke of using other sources for some Jeans beyond the initial 534,000 units in view of concerns regarding timely delivery.

5. Holford has adopted the Cherokee memorandum of the meeting, which is misdated February 16, 1994, as reflecting the agreement reached on March 10, 1994. (Tr. Aug. 30, 1994, 18:9–22, 19:12–14)

6. In its initial opposition papers, Cherokee claimed that late delivery problems began in late May and that all of the May units, as well as *substantial quantities* of June and July units, were untimely. (Elles Aff. ¶ 18) Holford responded that any problems in this period were worked out amicably and that Cherokee did not claim that there was any breach of the contract. (Zane Supp.Aff. ¶¶ 11–19 and Exs. F–K) Cherokee did not address this question, at least directly, in its reply. (Elles Supp.Aff. ¶¶ 5–6) Since the point is not material given my disposition of the motion, I need not resolve any factual question that may exist.

7. Indeed, there is evidence that Cherokee in May had requested and paid for air shipment and expedited delivery of certain goods. (Zane Supp. Aff. ¶¶ 17–18 and Ex. L–M)

Given my view of this motion, I can leave these matters to the arbitrators. What is significant here about this course of dealing is its relationship to the timing of Cherokee's resort to other suppliers of Jeans. Cherokee acknowledges that it began implementing what it called a "domestic supply contingency program"—a euphemism for enlisting other suppliers of Jeans—in February or March 1994. (Elles Aff. ¶ 20; Marsal Aff. ¶ 4) It admits also that it has gone to other sources for its holiday 1994 line, and does not deny that it has done so also for the spring 1995 line.[8] (Elles Supp.Aff. ¶ 13) While Cherokee does not say when it did so for the holiday line, Holford argues persuasively—and without contradiction by Cherokee—that it must have gone to other sources no later than mid-May and perhaps as early as March 1994. (Zane Supp.Aff. ¶¶ 45–48) Indeed, it is reasonable to conclude that Cherokee's July 5 order cancellations coincided with the start of deliveries from suppliers other than Holford.

*Holford's Alleged Acquiescence*

Cherokee's claim that Holford acquiesced in its use of other suppliers depends almost entirely on a February 24, 1994 letter from Bryan Marsal, Cherokee's chief executive, to Holford. (Elles Aff. ¶ 20 and Ex. D; Elles Supp.Aff. ¶ 12; Marsal Aff. ¶¶ 4–5) It contends that the letter informed Holford that Cherokee intended to use other suppliers and that Holford raised no objection. (*Id.*)

The letter began by stating that it was written to "clarify a number of misunderstandings and hopefully proceed with a clean slate." (*Id.* at 1) It recited that Cherokee had agreed to buy 534,000 units for delivery in the February 15 through May 31 period as a "base denim replenishment stock" and stated that Cherokee had planned to place additional orders to satisfy its sell-in needs. It reported that market reception had been stronger than anticipated, but added that Cherokee had decided "not [to] get too aggressive on the incremental sales volume" and to limit its May through August sell-in (exclusive of base replenishment inventory) to one million units. (*Id.* at 1–2)

The letter went on to say that Cherokee's start-up relationship with Holford "has projected substantial delivery delays" as a result of various problems and that the original delivery schedule for the base replenishment inventory had been delayed. (*Id.* at 2) It added that Cherokee was very concerned about timely delivery and stated that Cherokee therefore had "developed a *more costly* contingency plan" which would involve the use of other suppliers. This, Cherokee wrote, would leave Holford with responsibility for supplying a total of 915,000 units while Cherokee would purchase 585,000 units from alternative sources. (*Id.* at 2–3) (emphasis in original)

There is no evidence of any response by Holford.

Cherokee argues that the letter and the lack of objection from Holford establish that Holford acquiesced in the use of other suppliers for the back-to-school line. (*See* Elles Supp.Aff. ¶ 20; Marsal Aff. ¶¶ 4–5) It contends, moreover, that the letter placed Holford on notice that continued delivery delays would result in Cherokee using other suppliers more generally. (Elles Second Supp.Aff. ¶ 9) Holford, on the other hand, asserts that it knew that Cherokee was using other suppliers for certain back-to-school production—particularly a jet blue jean that Holford was unable to produce to Cherokee's satisfaction—but that it had no idea that Cherokee would procure an inventory of "basic" jeans from other suppliers. (Zane Supp.Aff. ¶¶ 48–49 & n. 6)

Holford's denial goes farther than the evidence will permit. The February letter indi-

---

8. Cherokee does not specifically respond to Holford's accusation that other suppliers have been engaged for the spring 1995 line. (Zane Supp. Aff. ¶¶ 32–33, 35) Instead, it restricts its discussion of future purchases to the holiday 1995 line. (Elles Supp.Aff. ¶ 13; Browndorf Aff. ¶ 9) And Holford only mentions the spring line briefly, similarly spending the bulk of its effort discussing production for the holiday 1995 line. (Zane

Supp.Aff. ¶¶ 45–49; Tr. Sept. 22, 1994, 16:14–24) I infer, however, that Cherokee is second sourcing the spring line as well, at least through February 1995, because Holford has received no orders for future deliveries and, according to the original contract, it takes Holford at least four months to deliver Jeans after Cherokee's order. (Zane Aff.Ex. A ¶ 9)

cated that Cherokee intended to procure 585,000 units from other sources of which less than one-fourth were jet blue and fully one-third were a "retail quick response inventory." (Elles Aff. Ex. D at 2) Holford did not object. Indeed, it worked out the March 10 agreement, which involved significant concessions to Holford by Cherokee. But there is no dispute that Cherokee decided some time in the period March–May 1994 to use other suppliers for its holiday line without informing Holford, and it appears that it is continuing to use those suppliers for its spring 1995 line.

*The Alleged Threat to Interfere With Holford Sales*

Holford has approximately 392,560 units of Cherokee brand Jeans on its hands which Cherokee purportedly has cancelled and, in any case, of which Cherokee has not taken delivery.[9] Holford wishes to sell these to third parties, but apprehends that Cherokee is likely to contact Holford's potential customers and interfere with any effort by Holford to dispose of the goods. (Zane Aff. ¶ 42) Indeed, it has submitted an affidavit indicating, albeit through vague hearsay, that Cherokee already has told one prospective customer that it would sue anyone who bought Cherokee brand goods from anyone other than Cherokee. (Herman Aff. ¶¶ 2–3) This, Holford says, has interfered with its ability to sell. (Zane Second Supp.Aff. ¶¶ 2–6) It therefore seeks to enjoin any such interference.

Cherokee denies, to the limited extent that the vague information provided by Holford permits, Holford's specific allegation. (Elles Second Supp.Aff. ¶¶ 2–3) It goes on to say that if Holford has a buyer, it should advise Cherokee. Cherokee then would make the sale and purchase the goods required to fill the order from Holford for cash. (*Id.* ¶¶ 4–5) But Cherokee nevertheless makes it plain that it opposes any effort by Holford to sell any of these goods through other distribution channels. (Elles Second Supp.Aff. ¶ 11)

In the circumstances, it is reasonable to expect that Cherokee will oppose efforts by Holford to sell any of these goods to others. This, indeed, is suggested by its opposition to this branch of Holford's application.

*Cherokee's Financial Condition*

Holford grounds its claim that it is threatened with irreparable injury on the contention that Cherokee is insolvent and may be unable to satisfy any money judgment that Holford might obtain. There is no dispute as to the facts.

Cherokee admits that its "present financial situation precludes it from paying outstanding creditors." (Cooper Aff. ¶ 2) It's annual report on Form 10–K, filed with the Securities and Exchange Commission on August 26, 1994, indicates that Cherokee lost $24 million in the year ended May 28, 1994, that its sales declined by almost one third in that year compared with the prior year, and that its net worth at year end was negative. (Benowich Aff.Ex. V at 10) The company expects to be unable to meet interest payments on certain debt due in November 1994. (*Id.* at F–29) The report of its independent auditors states that the company is unlikely to meet its scheduled 1995 debt service on its senior subordinated notes and expresses "substantial doubt about the Company's ability to continue as a going concern." (*Id.* at F–2) While Cherokee is seeking to restructure and to take other measures to salvage the situation, there is no assurance that it

---

9. The 392,560 units consist of the following:
   41,549 units in Los Angeles on July 7 but not accepted by Cherokee
   261,717 units which on July 7 were substantially advanced in production, for which transit had been booked, and which were received in Los Angeles during the period July 11 through August 20
   89,294 units in transit to Los Angeles as of September 26, 1994. These goods allegedly were scheduled to arrive in Los Angeles by September 10. (Zane Second Supp.Aff. ¶¶ 13, 17, 23.)

There is a dispute over whether Cherokee in fact cancelled all 392,560. Holford maintains that Cherokee did not cancel 142,911 of these units. (Zane Second Supp.Aff. ¶¶ 15) Cherokee, in an affidavit submitted at the end of the briefing process, asserts that it did cancel those goods when it became apparent they would be late. (Browndorf Aff. ¶ 5) For reasons discussed below, the resolution of this dispute is not material to disposition of this motion.

will be successful, in which case it could wind up in bankruptcy. (*Id.* at F–30)

### Discussion

■ In order to obtain a preliminary injunction, the movant must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). Moreover, a clear showing of a threat of irreparable harm is essential. *E.g., Triebwasser v. American Tel. & Tel. Co.*, 535 F.2d 1356, 1359 (2d Cir.1976). Absent such a threat, there is no occasion to consider either the merits or the balance of hardships.

### Threat of Irreparable Injury

Holford here complains of alleged past and prospective breaches of contract and, perhaps, torts by Cherokee—breach of the right of first refusal and interference with Holford's ability to sell Cherokee brand Jeans that Cherokee has failed to accept. It thus already has damage claims against Cherokee, and it may have additional claims based on future events. In ordinary circumstances, Holford would have a full, complete and adequate remedy at law. Holford, however, maintains that Cherokee's insolvency means that its damage remedy is illusory, at least in significant measure, and that it therefore is threatened with irreparable injury.

The fundamental commercial and legal reality is that one pursuing a damage claim against an insolvent defendant is unlikely to recover the full amount of its alleged loss even if it prevails and becomes a judgment creditor. While there may be exceptions, unsecured creditors, particularly unsecured creditors whose claims are unliquidated and contingent, rarely recover one hundred cents on the dollar, whether the affairs of an insolvent are resolved through a consensual workout, a Chapter 11 reorganization or liquidation. Hence, anyone with a claim against an insolvent defendant is threatened with a loss that might be termed "irreparable."

The question is whether there are circumstances in which such a loss ought to be a basis for injunctive or other equitable relief.

■ Insofar as Holford may be understood to claim that it is threatened with "irreparable" harm in that it may recover less than what it is owed with respect to past events, e.g., with respect to business lost as a result of any past breach of the right of first refusal, I think there is no basis for injunctive relief. With respect to Cherokee's past conduct, Holford's position is not materially different than any other unsecured creditor. Injunctive relief designed to make it whole, or in some way to improve its position, for such past injuries would benefit Holford at the expense of Cherokee's other creditors. *See* Laycock, *The Death of the Irreparable Injury Rule*, 103 Harv.L.Rev. 687, 716–17 (1990). I see no justification for doing so. In consequence, I hold that the mere fact that Holford may recover less than its entire loss with respect to any injury previously inflicted on it by Cherokee does not constitute irreparable injury for purposes of determining Holford's right to injunctive relief.

■ The situation stands differently with respect to Cherokee's future conduct. Cherokee here seeks to ensure that it sells (and profits from) all Cherokee brand jeans and to buy those Jeans on the terms most favorable to it. In short, it is engaged in profit-maximizing behavior. To the extent, if any, that it is maximizing profits by ignoring Holford's right of first refusal or wrongfully interfering with Holford's ability to sell off inventory that Cherokee has not bought, it is doing so at Holford's expense. Thus, the effect of holding that Holford's threatened injury as a result of Cherokee's future conduct is not "irreparable" in the sense required for injunctive relief would be to permit Cherokee's other creditors to benefit at Holford's expense. There is no justification for that either.

Cherokee, to be sure, disputes this conclusion. It acknowledges that some courts have permitted preliminary relief in circumstances like these and that the Second Circuit has

**372**

not resolved the point.[10] But it argues that preliminary injunctive relief should be available where there is a damage claim against an insolvent only on a showing that the defendant is likely to dissipate or remove assets from the jurisdiction.

Cherokee's argument is unpersuasive. It does not offer any reason why Cherokee and its creditors should be permitted to benefit by inflicting harm on Holford. Accordingly, I hold that the threat of injury to Holford from Cherokee's future actions constitutes irreparable injury sufficient to ground a motion for a preliminary injunction. *See id.* at 717. While insolvency relegates previously injured parties to the ranks of unsecured creditors, it does not confer a license upon the insolvent to inflict further injury for which the victim cannot be compensated in full. Hence, insofar as Holford seeks an injunction to prevent harm allegedly threatened by future conduct, I proceed to consider the merits and the equities.

*Likelihood of Success on the Merits*

### The Right of First Refusal

■ Holford argues that Cherokee has breached its right of first refusal in the past and, implicitly, that it is likely to do so in the future. Cherokee counters that it was justified by Holford's alleged delivery delays in seeking alternative sources of supply and, in any case, that Holford acquiesced in its actions.

*Alleged Delivery Delays.* While it is reasonably plain that Cherokee had some complaints concerning the timeliness of deliveries, Holford's position with respect to delivery delays is substantial.

I recognize, of course, that time ordinarily is regarded as being of the essence of a contract for the sale of goods. *See, e.g.,*

*Oshinsky v. Lorraine Manufacturing Co.,* 187 F. 120 (2d Cir.1911); II E. Allan Farnsworth, *Farnsworth on Contracts* § 8.18, at 450 (1990). And while the delivery schedule contained in the March agreement was modified repeatedly, at least until July 5, I assume *arguendo* that there came a point when Holford was in breach as to some perhaps many, of the goods. But that conclusion does not sweep the boards for Cherokee.

This contract contemplated many shipments over a five year period. If, as I assume, there were breaches by reason of late delivery as to some shipments, Cherokee had the right to treat those breaches as a breach of the entire contract if those defaults "substantially impair[ed] the value of the whole contract ..." N.Y.Unif.Comm.C. § 2–612(3) (McKinney 1993). Moreover, Cherokee had the right to terminate the contract on 180 days notice irrespective of any breach. But it did neither. Indeed, Cherokee's counsel specifically asserted during argument that the contract remains in effect. (Tr., Sept. 22, 1994, 14:13–14) Accordingly, Cherokee cannot excuse any future failure to comply with the right of first refusal on the basis of any prior delivery delays by Holford.[11]

*Acquiescence.* Holford plainly went along with Cherokee's February 24, 1994 proposal to purchase 585,000 units for its back-to-school line from other suppliers without giving Holford a right of first refusal. Whether its acquiescence was broader than that is somewhat murkier, but at a minimum presents serious questions going to the merits that are fair grounds for litigation. In light of my view of the balance of the equities, I need not determine whether Holford's position is sufficiently strong that it is likely to

---

10. *See In re Estate of Ferdinand Marcos Human Rights Litigation,* 25 F.3d 1467, 1477 (9th Cir. 1994); *Hughes Network Systems v. Interdigital Com. Corp.,* 17 F.3d 691, 694 (4th Cir.1994); *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386 (7th Cir.1984) (insolvency is a basis for finding irreparable harm); *cf. In re Feit & Drexler,* 760 F.2d 406, 416 (2d Cir.1985) (preliminary injunction may be granted when defendant threatens to dissipate assets to avoid a judgment, but silent on the direct question of insolvency as irreparable harm).

11. In view of my conclusion that Holford has shown no threat of irreparable injury, and therefore can obtain no equitable relief, with respect to Cherokee's prior actions, I need not determine whether and to what extent Cherokee was justified in disregarding the right of first refusal in the past on the basis of alleged delivery delays. That question will be for the arbitrators.

prevail on the merits of this aspect of its claim.

### Sales of Inventory

This brings me to Holford's claim that Cherokee should be enjoined from interfering with Holford's efforts to sell to third parties the 392,560 units on hand. At this point, Cherokee purportedly has cancelled all or substantially all of the goods that Holford has on hand, alleging that it was justified in doing so by reason of Holford's untimely deliveries. I see nothing in the parties' contract that prohibits Holford from disposing of those goods to third parties given that Cherokee has rejected them.[12] This view is confirmed by Section 2–602 of the Uniform Commercial Code, which provides in substance, with exceptions not relevant here, that any exercise of ownership by the buyer with respect to any rejected goods is wrongful as against the seller. N.Y.Unif.Comm.C. § 2–602(2)(a) (McKinney 1993); *see also id.* § 2–401(4) Hence, as a matter of contract and of the law of sales, I see no valid objection to Holford's disposal of the goods.

That leaves the issue whether the sale by Holford of these rejected goods, which bear the Cherokee trademark as a result of Cherokee's authorization (Zane Aff.Ex. A, ¶ 13), would infringe Cherokee's rights.

Whether sales by Holford in these circumstances would infringe Cherokee's trademark is a close question on which courts are not in agreement. *See* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25.11[3] (3d ed. 1994). In *Monte Carlo Shirt, Inc. v. Daewoo International (America) Corp.*, 707 F.2d 1054 (9th Cir. 1983), for example, the Ninth Circuit held that the manufacturer's sale of branded goods that had been rejected by the trademark holder was not trademark infringement. On the other hand, in *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir.1986), a divided panel held that goods manufactured by the trademark holder's supplier and sold by it to a third party after the trademark holder cancelled an order were not genuine and therefore infringed the mark.

The key to the *El Greco* decision was its reliance upon the right of the trademark holder "to control the quality of the goods manufactured and sold under the" mark. *Id.* at 395. The contract between the trademark holder and the supplier in that case provided that the holder's agent was to inspect the shoes prior to shipment to ensure that they met the holder's quality standards. The supplier's right to draw on the holder's letter of credit for payment was conditioned upon presentation of a certificate of inspection signed by the holder's agent "declaring that the merchandise had been 'approved for shipment in accordance with the buyer's delivery and quality specifications.'" *Id.* at 393. "[T]he inspection step was ... an integral part of the [trademark holder's] procedure for determining whether to accept its shoes and allow them to be sold under its trademark." *Id.* at 395. Since the trademark holder had been deprived of its bargained-for right to control the quality of the goods sold under its mark, the majority held that the actual quality of the goods was irrelevant and that the mark had been infringed. *Id.* at 395–96.

In contrast to the circumstances in *El Greco*, Holford has asserted, without contradiction, that Cherokee inspected and approved all of the goods in question at Hol-

---

**12.** If Holford were correct in claiming that Cherokee had not cancelled 142,911 of the units it has on hand, it would be arguable that Cherokee's time for performance had not yet arrived and that Holford therefore would not yet have a right to sell to those goods to others. These units were received in Los Angeles in August and September, *see* note 9, and Cherokee was not obliged to take them until 120 days later. (Zane Aff.Ex. D ¶ 2) Cherokee's affidavit claiming that it has cancelled these goods (Browndorf Aff. ¶ 5), however, amounts to an anticipatory repudiation of Cherokee's obligations. *See* N.Y.Unif.Comm.C. § 2–610, Official Comment 1 (McKinney 1993) ("anticipatory repudiation centers upon an overt communication of intention or an action which ... demonstrates a clear determination not to continue with performance"). In any case, Cherokee is estopped to deny the cancellation for purposes of this motion. *See David v. Showtime/The Movie Channel*, 697 F.Supp. 752, 763 (S.D.N.Y.1988); *United States v. Starrett City Assocs.*, 605 F.Supp. 262, 264 (E.D.N.Y.1985); *see also Konstantinidis v. Chen*, 626 F.2d 933, 937 n. 6 (D.C.Cir.1980) (judicial estoppel requires "merely a prior judicial acceptance of the factual assertion made by the party who now advances an inconsistent contention")

ford's factory in Hong Kong before the goods were shipped. (Zane Aff. ¶ 35) Equally important, the contract contemplated the sale by Holford to third parties of any goods remaining in the warehouse after ninety days and did not exclude from that right any goods rejected on the basis of quality concerns. (*Id.* ¶¶ 10, 13) In these circumstances, I conclude that Holford has a substantial likelihood of prevailing with respect to any trademark claim by Cherokee as to these goods because, unlike the situation in *El Greco,* Cherokee already has approved their quality.[13]

## The Equities

To the extent that I find that there is an issue worthy of further litigation on the question of Holford's right of first refusal, I must balance the equities to determine if "the harm which [it] would suffer from the denial of [its] motion is 'decidedly' greater than the harm [Cherokee] would suffer if the motion is granted." *Buffalo Forge Co. v. AMPCO–Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir. 1981); *see also Roland Machinery Co. v. Dresser Industries Inc.,* 749 F.2d 380, 386 (7th Cir.1984) (balance the potential harm to the plaintiff if the injunction is erroneously denied against the potential harm to the defendant if it is erroneously granted) Although I conclude that Holford has a substantial likelihood of success on the merits of its claim that interference by Cherokee with attempts to sell the Jeans would be wrongful,[14] I will consider also the balance of the equities with respect to this aspect of the requested relief in case the Second Circuit either disagrees with my assessment of the merits, or decides that such an analysis is helpful even when there is a substantial likelihood of success on the merits. *See* Leubsdorf, *The Standard for Preliminary Injunctions,* 91 Harv.L.Rev. 525, 545 (1978).

### The Right of First Refusal

Holford would suffer more harm from the absence of an injunction preventing Cherokee's future breach of the right of first refusal than Cherokee would from its issuance. The harm Holford would suffer with respect to the right of first refusal as to future orders is the possibility it would lose business that it otherwise might have. (Zane Aff. ¶ 41) There are two dimensions to this harm. First, Cherokee's insolvency may prevent Holford from collecting in full on any damage award it may recover for Cherokee's future breaches. Second, it may well prove difficult to establish whether Holford would have matched any other offers. In either case, it may be impossible to be place Holford in the same economic position that it would have enjoyed had the right of first refusal been enforced.

Cherokee, on the other hand, would bear only a small risk if it respects Holford's right of first refusal. Because the right requires Holford to match or better the terms of Cherokee's other offers, including financing and delivery times, Cherokee's only risk is the possibility that Holford would assert its preemptive right and then fail to deliver on the promises it makes to match other suppliers' deals. *See Wildenstein & Co. v. Wallis,* 79 N.Y.2d 641, 584 N.Y.S.2d 753, 759, 595 N.E.2d 828, 834 (1992) (holding that a right of first refusal, in order to be enforceable, requires the holder to at least match alternative offers) This risk, even if higher than normal for contracts like this in view of past events, is mitigated because Cherokee would have both a breach of contract claim against Holford and the opportunity to cover with other suppliers if Holford cannot keep its promises.

I conclude from the foregoing that the balance of the equities on this point tips decidedly in favor of Holford.

### Sales from Inventory

The showings made by both sides concerning the equities pertinent to sales by Holford of the 392,560 units in inventory are thin. Holford is sitting on a large inventory, and

13. Of course, this logic does not apply to the March Agreement's third tranche of 221,000 units. (Zane Aff.Ex. D ¶ 3) There is no basis for permitting Holford now to assemble Jeans from raw material and sell them under the Cherokee brand.

14. The finding of likelihood of success may justify an injunction without regard to the equities as long as there is a threat of irreparable injury. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979)

there is some evidence—contradicted by Cherokee—that the Jeans are declining in value. (Zane Aff. ¶ 5) Holford argues also that it is in a financial bind because it has capital tied up in the goods, a contention that is not disputed but is not elaborated upon. (Zane Aff. ¶ 3) Cherokee's insolvency, however, does put Holford in a position in which any decline in value from this point forward may not be fully collectible.

Cherokee claims that it would be injured by the sale of these goods through other channels because this would divert sales from it. (Tr. Aug. 30, 1994, 35:5–7) This loss, however, would be purely economic, equivalent to the loss of any marginal profit Cherokee would have made but for the Holford sales. There has been no effort to quantify what that injury might be. Although one can imagine circumstances in which diversion of sales from a company teetering on the brink of insolvency might cause irreparable injury by impairing its ability to survive as a going concern, Cherokee does not argue this point. Therefore, any injury Cherokee might suffer if erroneously enjoined would be fully compensable in damages provided an adequate injunction bond were required.

In these circumstances, the balance of the equities tips decidedly in favor of Holford because it is threatened with irreparable injury while Cherokee can be fully protected against its potential financial loss as long as I require an adequate bond.

### Conclusion

The motion is granted in part and denied in part as reflected in the order entered herewith. Inasmuch as neither party has addressed the amount of the bond, the Court will consider any application either party may promptly make to adjust the amount contained in the order.

The foregoing constitutes the Court's findings of fact and conclusions of law. Fed. R.Civ.P. 52.

SO ORDERED.