**ABSOLUTE RECOVERY HEDGE FUND, L.P., et ano.,**
**Plaintiffs,**

v.

**GAYLORD CONTAINER CORP.,**
**et al., Defendants.**

**No. 01 CIV 8811 LAK.**

United States District Court,
S.D. New York.

Feb. 19, 2002.

382

Steven G. Schulman, Milberg Weiss Bershad Hynes & Spectrie, LLP, New York City, for Plaintiffs.

Richard L. Brusca, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, for Defendants Temple–Inland Acquisition Corporation, Temple–Inland Inc., and Inland Container Corporation I.

Thomas O. Kuhns, Peter D. Doyle, Kirkland & Ellis, New York City, for Defendant Gaylord Container Corporation.

John M. Callagy, Sarah L. Reid, Kelley Drye & Warren LLP, New York City, for Defendant State Street Bank and Trust Company.

## MEMORANDUM OPINION

KAPLAN, District Judge.

On January 22, 2002, the Temple–Inland defendants commenced the latest in a series of tender offers for the common stock and debt securities of Gaylord Container Corporation ("Gaylord"). The offer is scheduled to expire on February 19, 2002 at 11:59 p.m. Plaintiffs, a hedge fund holding a small amount of certain Gaylord notes and its affiliate, seek a temporary restraining order requiring that $3 million be deducted from the consideration paid to Gaylord securities holders in the event the tender offer closes in order to fund a possible attorneys' fee to their counsel on the theory that the consideration paid in the tender offer, to the extent that it exceeds the consideration offered in the first tender offer, is a common fund attributable at least in part to their efforts and thus the proper subject of a fee award.

I

## A. The First Tender Offers and the Start of the Litigation

On September 27, 2001, Temple–Inland and Gaylord announced the signing of a merger agreement (the "Agreement") by which Temple–Inland would acquire Gaylord. Pursuant to the Agreement, Temple–Inland began tender offers (the "First Offer") for all of Gaylord's outstanding shares, 9–3/8% Senior Notes due 2007, 9–3/4% Senior Notes due 2007, and 9–7/8% Subordinated Notes due 2008 (collectively, the "Notes"). The prices offered for the Notes were $735 per $1,000 in principal amount of the Senior Notes and $240 per $1,000 in principal amount of the Subordinated Notes. The First Offer was contingent on the tender of at least two-thirds of the outstanding common stock and 90 percent of the aggregate principal amount of the outstanding notes of each series. In addition, Temple–Inland offered an additional $20 per $1,000 in principal amount for each note tendered prior to the consent payment deadline of midnight on October 12, 2001 in exchange for the tendering noteholders' consent to various amendments to the indentures, most notably a waiver of a change of control provision which, absent amendment, would have prevented consummation of the offers.[1] These amendments required for adoption the affirmative vote of the holders of more than 50 percent of the aggregate principal amount of each series of Notes. The offer was scheduled to expire on October 29, 2001.

On October 1, 2001, plaintiffs commenced this action, purportedly on behalf of a class consisting of holders of the Senior Notes. The complaint asserts, *inter alia*, that Gaylord was insolvent or, at least, in the zone of insolvency, that it therefore had assumed fiduciary duties to its creditors including the noteholders, and that it had breached those duties by entering into the merger agreement. The essence of the claim was that the First Offer constituted a breach of fiduciary duty in that Gaylord's common stockholders were to receive substantial payments before the Notes were to be paid in full.[2] In addition, plaintiffs claimed that the consent payment, coupled with the early deadline for obtaining it, improperly coerced noteholders to tender.

On October 9, 2001, plaintiffs moved for a temporary restraining order preventing defendants from proceeding with the tender offer or consummating the merger. Before the application was heard, however, it became clear that the First Offer was a failure. On October 10, 2001, counsel representing more than 50 percent of the aggregate principal amount of the Notes advised Gaylord that his clients would not tender their notes or deliver their consents. He accused the board of "gross breaches of fiduciary duty," arguing in substance that the structure of the First Offer allowed an improper diversion of the purchase consideration to the holders of the Gaylord equity and away from the noteholders, a diversion said to be inappropriate in view of Gaylord's allegedly insolvent state.[3] Thus, the First Offer was dead on arrival.

---

1. Warner Decl. ¶¶ 3–6.

2. Strictly speaking, the theory was that the Gaylord board's facilitation of the First Offer was a breach of fiduciary duty in which Temple–Inland participated.

In an amended complaint dated October 11, 2001, plaintiffs added a claim under Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e), and Rule 14e-3 thereunder, 17 C.F.R. § 240.14e-3 (2001).

3. Gaylord Ex. 1.

The previously scheduled argument of plaintiff's motion for a temporary restraining order took place on the following day, October 11, 2001. After the Court was informed that there was no need for immediate relief in light of the refusal of so many of the noteholders to tender, counsel reached an agreement to extend the consent solicitation and withdrawal deadlines until October 26, 2001, with a hearing on the motion, if needed, to be scheduled in advance of that date.[4] It was apparent, however, that there would be no need for any further proceedings unless a large number of noteholders changed their minds or the offer was changed materially.

Despite these developments, the parties began preparations for discovery. On October 15, 2001, however, they agreed to suspend proceedings on the motion to permit negotiations. Temple–Inland repeatedly extended the expiration date of the tender offers, ultimately until November 30, 2001, at which point they were permitted to expire without Temple–Inland acquiring any shares or notes.

### B. The Second Tender Offers

On December 3, 2001, Temple–Inland made a second set of tender offers for the Gaylord securities (the "Second Offer"). The price per common share was reduced from $1.80 to $1.25. The prices for the Notes were increased to $875 per $1,000 in principal amount of both classes of Senior Notes and to $300 for the Subordinated Notes. Thus, had the offers been completed and all outstanding securities tendered, the common stock would have received an aggregate of $16.9 million less than in the First Offer, while the noteholders in the aggregate would have received $86 million more. But these offers were not materially more attractive to the noteholders than the First Offer. They expired without success on January 7, 2002.

### C. The Third Tender Offers

Temple–Inland launched its latest attempt on January 21, 2002, announcing the current tender offers, which expire on February 19, 2002 (the "Third Offer"). The consideration for Gaylord common shares again was reduced, now to $1.17 per share. The price offered for the Senior Notes was increased to $900 per $1,000 in principal amount while that for the Subordinated Notes remained at $400.

## II

As plaintiffs seek to escrow part of the tender offer price on the theory that the increased consideration offered by Temple–Inland is a common fund benefitting noteholders that is attributable at least in part to their efforts in this litigation, it is important to examine the evidence, bearing in mind that this aspect of the litigation is at a preliminary stage.

This is not a situation in which attorneys for a class member championed the interests of small, disorganized, widely dispersed security holders. To the contrary, a small group of major institutional investors led by Fidelity Management & Research Co. ("Fidelity") owns the lion's share of the Notes. Indeed, Fidelity and four other entities at relevant times owned more than 50 percent of each of the three classes of notes.[5] They retained their own counsel and concluded, they say without any analysis or assistance from plaintiffs or their counsel, that the First Offer was inadequate and that they would not tender.[6] They thereafter negotiated directly

---

4. Tr., Oct. 11, 2001, at 38.

5. Van Duzer Decl. ¶ 2.

6. *Id.* ¶ 5.

with Temple–Inland's investment banking firm and, according to them, brought about the improvement in the deal that currently is available without assistance from plaintiffs.[7]

Plaintiffs argue that the Court should not credit the defendants' assertions that plaintiffs had nothing to do with the improvement of the deal. They portray the October 11 agreement to extend the deadline for the consent solicitation and to make it coterminous with the expiration of the tender offers, which took place at the hearing on plaintiffs' motion, as "a decisive victory for plaintiffs and their counsel."[8] And they claim that Wilbur Ross, plaintiffs' principal, and plaintiffs' counsel participated in discussions with the Fidelity group which were helpful in obtaining the change in the terms of the transaction.[9]

## III

■■■ A number of propositions, none of which is disputed, forms the backdrop for this application. Under both federal and Delaware law, a party acting on behalf of a class which is successful in creating a common fund for the benefit of class members generally is entitled to an award of attorneys' fees from the common fund.[10] Where the common fund is to be distributed in advance of an award in such a way as to make collection of a fee subsequently awarded from the individual beneficiaries impracticable, injunctive relief may be ap-

propriate to preserve the fund on the theory that the attorneys and their client otherwise would be injured irreparably by the distribution.[11] And the parties seem to agree that the applicable standard here is that which typically governs motions for preliminary injunctions in this Circuit—the movant must demonstrate a threat of irreparable injury and either (i) a likelihood of success on the merits, or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly in the movant's favor.[12]

### Irreparable Harm

All agree that the only permissible source for any fee that might be awarded in this case is the alleged common fund or, if the fund is distributed without provision for a fee having been made, the noteholders who benefit from the distribution. Nor does anyone dispute the proposition that plaintiffs would be facing irreparable injury if distribution of the fund would leave them with no practical means of recovery from the beneficiaries.[13] The question, rather, is whether that really is the situation here.

Defendants point out that Fidelity and four other entities represent holders in interest of more than 50 percent of the aggregate principal amount of each of the three series of notes. Indeed, only ten custodians hold 88.4 percent of the notes,

---

7. *Id. passim;* Warner Decl. *passim;* Zicari Decl. *passim;* Brusca Decl. ¶ 3.

8. Schulman Aff. ¶ 46.

9. *E.g.,* Ross Decl., Feb. 14, 2002, ¶ 4.

10. *See, e.g., Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 124–25, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Tandycrafts, Inc. v. Initio Partners,* 562 A.2d 1162, 1164–65 (Del.1989).

11. *See, e.g., Savoie v. Merchants Bank,* 84 F.3d 52, 58–59 (2d Cir.1996).

12. *Forest City Daly Hous., Inc. v. Town of North Hempstead,* 175 F.3d 144, 149 (2d Cir. 1999); *Alliance Bond Fund v. Grupo Mexicano de Desarrollo, S.A.,* 143 F.3d 688, 696 (2d Cir.1998), *rev'd on other grounds,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999).

13. *See Savoie,* 84 F.3d at 58.

and the Fidelity group collectively accounted for 90 percent of the senior notes and 82 percent of the subordinated notes. In consequence, plaintiffs' claim of threatened irreparable injury is quite exaggerated. While it is not clear precisely how many beneficial owners there are, there is every reason to suppose that plaintiffs, if the fund were distributed without making provision for a fee, could obtain well over half of any fee to which they might be entitled by suing five or so entities, presumably on a theory of unjust enrichment. But that is not a complete answer to plaintiffs' position. The fact remains that there is a risk that distribution of the fund without making provision for a fee would render collection from at least some beneficiaries impracticable. That is sufficient basis to open the door to the possibility of injunctive relief.

*The Merits*

 Under Delaware law, which in light of Gaylord's Delaware incorporation governs plaintiffs' entitlement to a fee insofar as the action rested on claims of breach of fiduciary duty,[14] plaintiffs' application to recover for "benefits" conferred outside the lawsuit requires a demonstration that (1) the suit was meritorious in the sense of being able when filed to withstand a motion to dismiss, (2) the action producing the benefit was taken by the defendants before a judicial resolution was achieved, and (3) the resulting benefit was causally related to the lawsuit.[15] The second prong of this test plainly is satisfied, and the Court assumes without deciding that the complaint would withstand a motion to dismiss. Battle therefore is joined on the issue of causation.[16]

 Here, the evidence that the lawsuit had nothing to do with any benefit conferred upon the noteholders is very powerful. Given the substantial interest in the notes owned by Fidelity and its allies, the offers were doomed from the start absent their support. Litigation was entirely unnecessary. For all practical purposes, all of the noteholders were represented by the Fidelity group, which owned a majority of the outstanding notes, was independently represented, and which certainly was in a position to do whatever was necessary to protect the interests of all. The negotiations that preceded the offer that now is pending took place between the Fidelity group, its counsel, and representatives of Temple–Inland. While the Court does not doubt that there were communications between plaintiffs' Wilbur Ross, a well known and sophisticated investor in distress securities, and the Fidelity group, there simply is no reason to believe that the litigation played any significant role.

Plaintiffs counter by arguing that even if the litigation did not yield any specific monetary benefit, it at least achieved postponement of the deadline for the consent

---

14. *See, e.g., BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F.Supp.2d 123, 129 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1321, 2000 WL 232805 (2d Cir.2000); *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 116 (S.D.N.Y.1999); *Clark v. Kelly*, No. C.A. 16780, 1999 WL 458625, at *4 (Del.Ch. June 24, 1999).

15. *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del.1997); *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 727 A.2d 844, 851 (Del.Ch.1998).

To the extent plaintiffs' claim rests on the Section 14(e) claim, there is no required showing of initial merit. *See Savoie*, 84 F.3d at 57 (Second Circuit does not require showing that the complaint had merit). This point, however, is academic in view of the grounds upon which the motion is decided.

16. Plaintiffs argue that the burden of proof on the issue of causation is on the defendants, citing *Savoie*, 84 F.3d at 57, and *Tandycrafts*, 562 A.2d at 1165. The Court so assumes for purposes of this motion.

solication from October 12 until October 26, 2001, thus eliminating the coercive effect of that aspect of the First Offer, and resulted in the abandonment of that device in the subsequent offers. But that argument is unpersuasive as well. Once Fidelity informed Temple–Inland in October 10 that it represented holders of more than 50 percent of each series of notes and that its group would not tender, the consent solicitation became academic. Even assuming that the consent solicitation as originally formulated would have been coercive had the notes been more broadly dispersed, as seems likely, the fact remains that Temple–Inland misjudged the marketplace. Rather than allowing themselves to be stampeded, Fidelity and the holders who allied with it acted collectively to nullify the coercive effect of the offer by joining making clear that the consents necessary to amend the indentures could not be obtained. Thus, it was the collective action of the noteholders, not the lawsuit, that resulted in the elimination of the arguably coercive consent solicitation.

The foregoing considerations make it unlikely that plaintiffs, whether aided by a presumption or not,[17] will prevail on their claim that there was a causal connection between their actions and any benefit to the class. In considering whether there are serious questions going to the merits, however, it is useful to begin with some comments about the stage that the litigation has reached and the appropriate role of the Court in evaluating this issue.

Plaintiffs contend that it would be inappropriate for the Court definitively to resolve the causation issue, which of course is true. But they go on to imply that the Court must give them the benefit of the doubt, or conclude at least that there are serious questions going to the merits, because there has been no discovery, the evidence is limited to affidavits, defendants are self interested, and no evidentiary hearing has been held. That is a more troublesome proposition.

To begin with, plaintiffs sought no discovery on this issue and no evidentiary hearing. They brought this motion on February 4 and have been content at all times to rely on affidavits and argument. Even assuming that an evidentiary hearing might have been granted had a request been made, plaintiffs certainly have waived the point.[18] Indeed, there is every reason to suppose that they deliberately avoided seeking an evidentiary hearing precisely for the purpose of avoiding findings of fact based on determinations of credibility.[19]

But the lack of an evidentiary hearing really is beside the point because there is no substantial conflict in the evidence. Plaintiffs do not claim to have participated in any substantive negotiations with the defendants. Fidelity and its allies had no need of plaintiffs or their counsel. So while the Court is entirely mindful that the those resisting this motion all are self in-

---

17. *Supra* note 16.

18. *E.g., Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 256 (2d Cir.), *amended,* 890 F.2d 569 (2d Cir.), *cert. dismissed,* 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989).

19. Plaintiffs' actions here are comparable to those of the defendants in *Consolidated Gold Fields*. The defendants there sought no evidentiary hearing in the district court, content-

ing themselves with submitting affidavits while arguing that the district court could not resolve conflicts in the evidence in view of the absence of an evidentiary hearing. When the plaintiffs' motion for a preliminary injunction was granted, defendants appealed on the ground, *inter alia*, that the district court had erred in failing to hold an evidentiary hearing. When put to it by the panel, defendants declined an evidentiary hearing. *Id.* at 256 n. 3.

terested—the Fidelity group because they may see defeating it as a way of avoiding payment of fees to plaintiffs' counsel and Temple–Inland because it fears that escrowing funds from the tender offers may have a negative impact on its prospects for success—the logic of this situation strongly favors the defendants. The likelihood that this litigation played any substantial role in producing a benefit for the class is extremely small. Accordingly, and recognizing that any finding at this stage is provisional, the Court finds that plaintiffs did not play a substantial role.

In these circumstances, the question whether plaintiffs' chance of success on the causation issue is sufficiently substantial to make it a fair ground for litigation could provide grist for a metaphysical exercise. After all, it is theoretically possible that further litigation could produce some unanticipated "smoking gun" or otherwise reverse plaintiffs' fortunes here, just as many other speculative contingencies are theoretically possible. But that seems so unlikely that this Court perceives no substantial question. Even if it did, the Court's view of the balance of hardships would be decisive.

*Balance of Hardships*

■ "[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." [20]

If the Court mistakenly were to deny a preliminary injunction and the tender offers succeeded, plaintiffs would be forced to bring actions against the noteholders in order to pursue an attorneys' fee. This would be relatively easy insofar as Fidelity and its four named allies, together owning

between 50 and 90 percent of the notes, are concerned. Although it is not entirely clear, the Court assumes that it would be impractical to sue others. In consequence, assuming *arguendo* that plaintiffs are entitled to a fee on a common benefit theory, the erroneous denial of an injunction would deprive them of at least 10 and as much as almost 50 percent of what they might recover if an escrow now were required.

On the other side of the ledger, defendants would confront substantial risks if an injunction erroneously were granted. While plaintiffs seek an escrow of $3 million, which would amount to about 0.4 cents per dollar in principal amount of the notes, the risk of effectively reducing the offering price for the notes by that amount is considerable. It must be borne in mind that the Second Offer, which failed, was at a price of 87.5 cents on the dollar, while the Third Offer is at only 90 cents per dollar. In view of the fact that the price difference between the current offer and the failed offer is only 2.5 cents on the dollar, there is a significant possibility that the escrowing of 0.4 cents—or 16 percent of the amount of the increase—would defeat the offer and thus deprive Temple–Inland of what might be a unique opportunity.

This risk is compounded by the impact of granting the relief plaintiffs seek on the timing of the offer. As noted, the offer is scheduled to close at midnight tonight. It appears, however, that granting the requested relief would be a change in the consideration offered to noteholders, in which case Temple–Inland would be obliged by Rule 14e–1(b) to keep the tender offers open for at least another ten

**20.** *Tradescape.com v. Shivaram,* 77 F.Supp.2d 408, 411 (S.D.N.Y.1999); *accord, Foulke by Foulke v. Foulke,* 896 F.Supp. 158, 162 (S.D.N.Y.1995); *Holford USA Ltd. v. Cherokee, Inc.,* 864 F.Supp. 364, 374 (S.D.N.Y.1994).

business days [21] and extend the withdrawal rights,[22] both of which enhance the risk.

Nor is the risk to Temple–Inland the only relevant consideration here. There is a patent conflict between plaintiffs' counsel and the class they purport to represent. That of course is true whenever the question turns to legal fees, an issue on which lawyer and client are inherently at odds. But there is an added component here. Plaintiffs' counsel, by seeking this escrow, are asking the Court and the noteholders to take a chance that the escrow will make the difference between the offers succeeding and failing. And if the offers fail because of the escrow, those noteholders who want to sell at 90 cents on the dollar will be deprived by plaintiffs' counsel of the opportunity to do so.

In sum, the balance of hardships here rests on a comparison of two rather different risks. Plaintiffs' counsel, if they erroneously are denied relief, would be subject to some inconvenience in pursuing noteholders and presumably would be unable to collect in full any fee to which they would be entitled, although they would be far from without remedy. Defendants, on the other hand, would risk defeat of the offers by virtue of a mistaken grant of an injunction. This seems the greater of the two risks, and any doubt is resolved by taking into account the interests of the noteholders, who may be deprived of the opportunity to sell at what they consider an advantageous price without even having an opportunity to be heard on this motion. While there are potential hardships on all sides, the Court concludes that plaintiffs have failed to establish that the balance of hardships tips decidedly in their favor.

**IV**

For the foregoing reasons, plaintiffs' motion for a temporary restraining order to escrow $3 million to fund any award of attorneys' fees that might be made is denied. The foregoing constitutes the Court's findings of fact and conclusions of law.

SO ORDERED.

---

**21.** 17 C.F.R. § 240.14e–1(b) (2001).

**22.** *See* 15 U.S.C. § 78n(d)(5); 17 C.F.R. § 240.14d–7(a)(1) (2001).