**The DUN & BRADSTREET CORPORATION, Plaintiff,**

v.

**HARPERCOLLINS PUBLISHERS, INC., Defendant.**

No. 93 Civ. 6616(LAK).

United States District Court, S.D. New York.

Jan. 10, 1995.

---

104

Thomas A. Butler, Butler, Fitzgerald & Potter, New York City, for plaintiff.

Slade R. Metcalf, Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, New York City, for defendant.

**OPINION**

KAPLAN, District Judge.

In 1977, defendant's predecessor in interest purchased the Thomas Y. Crowell book publishing subsidiary ("Crowell") of plaintiff's predecessor in interest, Dun–Donnelly Corporation.[1]  Among Crowell's publications at the time of the purchase was *Dun & Bradstreet's Guide to $Your Investments$:*

---

1.  As the details of the corporate structure of the parties are not material to the resolution of this case, we refer to plaintiff and its affiliates as D & B and to defendant and its affiliates as Harper without distinguishing among the related entities except where necessary.

19XX (the "*Guide*"), which has been revised annually with the appropriate year substituted in the title.

The issue in this case is whether Harper still has the right to use the Dun & Bradstreet name in the title pursuant to a license executed in connection with its purchase of Crowell. D & B contends that Harper's right to use the name expired with the termination of the contract between Crowell and one C. Colburn Hardy, the author of the *Guide* at the time of the Crowell acquisition, or, at the latest, when Hardy stopped writing the *Guide*. It asserts that Harper's continued use of the Dun & Bradstreet name therefore constitutes trademark infringement, false designation of origin in violation of the Lanham Act, and unfair competition. D & B seeks only an injunction against future use of the Dun & Bradstreet name and ancillary equitable relief.[2] Harper, for its part, asserts that the license authorizes it to use the Dun & Bradstreet name in the title indefinitely.

The action has been submitted to the Court for trial on a stipulated record consisting of affidavits, deposition transcripts and documentary evidence with the understanding that the Court is empowered to make findings of fact as if it had taken oral testimony. This constitutes the Court's findings of fact and conclusions of law.

### Facts

*Background*

The *Guide* began at least as early as the mid–1960s, when it was called *Guide to $Your Investments$* or *$Your Investments$*. It was published originally by Pilot Publishing and distributed by Hawthorne Publishing. (Metcalf Aff. Ex. D at 19) McGraw-Hill took over the book in the early 1970s and apparently published it until the rights were acquired by Crowell in the early 1970s. (*Id.* 20, 23–25) At or shortly after Crowell's acquisition, Crowell entered into a contract with Hardy to revise or update the book.

(*Id.* 26–33; DX[3] V) The arrangement contemplated annual revisions.

The moving force behind Crowell's acquisition appears to have been Paul Fargis of Crowell, who had been familiar with the book during his employment by Hawthorne in the 1960s and persuaded Crowell's president, Lewis W. Gillenson, to acquire the rights. (*Id.* 10, 25–26)

At about the same time that Crowell acquired the rights to the *Guide* and signed Hardy to revise it each year, D & B acquired Crowell (Buchanan Aff. ¶ 5) and encouraged Crowell to use the Dun & Bradstreet name to enhance Crowell's sales. So the name was changed to *The Dun & Bradstreet Guide to $Your Investments$*. (Metcalf Aff. Ex. D at 27–28) Interestingly, D & B was not involved in investments at the time the change in title was made. "The idea," according to Fargis, "was to take a respected authoritative name to give the book some more authority." (*Id.* at 28) Hence, beginning with the 1974 edition, the *Guide* was revised each year by Hardy and published under a couple of slightly different titles, all of which included the Dun & Bradstreet name.

*The 1977 Hardy Contract*

On March 7, 1977, Fargis, on behalf of Crowell, offered Hardy a new contract, signed by Hardy a week later, which governed future editions of the *Guide* (the "1977 Hardy Contract"). (Metcalf Aff. Ex. E at tab 8) It obligated Hardy to furnish a revised manuscript each year. It contained no provision for termination. There was no indication that Crowell might dispense with Hardy's services, although Hardy granted Crowell all of his rights in and to the material, and the contract provided that the work would be copyrighted in Crowell's name.

*Harper's Acquisition of Crowell*

On the same day that Crowell offered the new contract to Hardy, Harper and D & B entered into a letter of intent ("LOI") that contemplated the acquisition by Harper of

---

2. Since D & B's claims turn exclusively on whether Harper's contractual right to use the Dun & Bradstreet name has terminated, the false designation of origin issues presented in *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775 (2d Cir.1994), and analogous cases are not raised here.

3. "DX" refers to defendant's exhibits. "PX" refers to plaintiff's exhibits.

Crowell. (Buchanan Aff. Ex. B) The LOI was drafted initially by D & B's Buchanan and sent to Harper. (Metcalf Aff. Ex. E at 44–45 & tab 7) It dealt explicitly with the right of Crowell, under Harper ownership, to use the Dun & Bradstreet name in the titles of books in which it previously had used the name. Paragraph 8 provided:

> "Dun–Donnelly or one of its affiliated companies will retain all rights to the 'Dun–Donnelley' and 'Dun & Bradstreet' names. *Where the contractual arrangements contemplate reprints or revisions of books containing such names in their imprints or titles,* the Purchaser [Harper] will have the right to continue to use the Dun–Donnelley and Dun & Bradstreet names, provided, however, that Dun–Donnelley shall have the right to approve any such revisions, such approval not to be unreasonably withheld. *Absent such contractual provisions,* the Purchaser will have the right to sell out all such books in print but will eliminate such names and imprints when the books are reprinted or revised." (Emphasis added)

None of those who actually negotiated the transaction testified concerning the meaning of the italicized language.[4] Harper, however, acknowledges that the "contractual arrangements" referred to in the LOI were contracts between Crowell and the authors of the works. (Metcalf Aff. Ex. G at 14) Thus, the LOI seems to have indicated that Crowell's right to use the Dun & Bradstreet name in book titles after the acquisition would be limited to selling off existing stocks of such books and publishing revisions of such books to the extent then-existing contracts with authors contemplated such revisions. Put another way, Crowell was permitted to use the name in the titles of revisions of existing works where Crowell already was bound to authors for preparation of the revisions, but not otherwise.

The LOI, however, explicitly stated that nothing contained therein was to be binding upon either party absent execution of a definitive written agreement, which was to include the matters set forth in the LOI as well as other provisions described in more general terms. (*Id.* ¶ 12) Thus, the LOI manifestly contemplated further negotiations between the parties.

*The Acquisition Agreement and License*

The transaction contemplated by the LOI ultimately took place. D & B and Harper entered into a Stock Purchase Agreement, dated as of April 25, 1977, pursuant to which Harper acquired from D & B all of the issued and outstanding shares of Crowell and Conklin Book Center, Inc. for $9.2 million subject to certain post-closing adjustments. (Buchanan Aff. Ex. C)

At the same time, D & B entered into a license with Crowell, drafted initially by Buchanan (Metcalf Aff. Ex. E at 51 & tabs 10, 12), for the use by Crowell of the Dun & Bradstreet name (the "License Agreement"). (*Id.* Ex. D) It contains provisions central to this action. Paragraph 1 provided as follows:

> "1.(a) [D & B] hereby grants to Crowell, at no cost to Crowell, the right to continue the use of the 'Dun & Bradstreet' name in the titles of, and to continue the use of the 'Dun–Donnelley' imprint on, such of Crowell's book [*sic*] as (i) are currently in print and currently have said names in the titles thereof or imprint thereon and (ii) are in the process of being printed and published as of the Closing Date ... until the inventory of any such book bearing the 'Dun & Bradstreet' name in the title or the 'Dun–Donnelley' imprint has been exhausted. A list of the books to which the license hereinabove granted shall apply, together with copies of any contracts in existence covering the publishing of said books, is attached as Schedule A hereto.

---

4. The deal was negotiated for D & B by John Mileham, then executive vice president of Dun & Donnelley and now deceased. (Buchanan ¶ 7) The chief negotiator for Harper was its executive vice president, Brooks Thomas. (*Id.;* Metcalf Aff. Ex. G at 9–11) William H. Buchanan, Jr., then an associate general counsel of D & B, Ted Miller, then general counsel of Harper, and Bar- bara Hufman, then a member of the Harper legal staff, played legal roles. (Buchanan Aff. ¶ 7; Metcalf Aff. Ex. E at 38–39; *id.* Ex. G at 13) Messrs. Mileham, Thomas and Miller did not testify. Buchanan and Hufman either were not involved in or do not recall the substance of any discussions between the D & B and Harper negotiators. (*Id.* Exs. E at 38–39, G at 12)

"(b) *[D & B] hereby assigns to Crowell, effective the Closing Date, all of [D & B]'s rights in and to the books listed in Schedule A hereto (other than the 'Dun & Bradstreet Handbook of Credit and Collection'), including [D & B]'s rights to reprint and/or revise said books and to use the Dun & Bradstreet name in the titles thereof;* provided, however, that Crowell shall not have the right to use the 'Dun & Bradstreet' name in the title of, nor the right to use the 'Dun–Donnelley' imprint on, any revisions of said books unless [D & B] shall first have approved said revisions, such approval not to be unreasonably withheld. With respect to the 'Dun & Bradstreet Handbook of Credit and Collection,' [D & B] hereby assigns to Crowell, effective the Closing Date, all of [D & B]'s rights in and to said book until the inventory therefor has been exhausted and any right to reprint and/or revise said book has expired. Thereafter, Crowell agrees that all rights thereto shall belong to D & B.

"(c) Upon the exhaustion of the inventory of any books listed on Schedule A hereto and upon the expiration of any rights to reprint and/or revise said books, Crowell agrees that it will remove the 'Dun–Donnelley' imprint from, or the 'Dun & Bradstreet' name from the title of, any such books before it exercises any further rights it may have with respect to said books." (Emphasis added)

The *Guide* for 1977–78 was listed on Schedule A. (Metcalf Aff. Ex. E at tab 6 (last page)) The 1973 and 1977 Hardy Contracts were attached to the original License Agreement. (DX AA)

As is readily apparent, the License Agreement, to state the case most favorably to D & B, is susceptible of an interpretation in respect of Crowell's right to use the Dun & Bradstreet name in the title of revisions of the *Guide* that is quite a bit broader than was contemplated by the LOI. Unlike the LOI, the License Agreement did not in terms limit the use of the Dun & Bradstreet name

to revisions that were contemplated by preexisting contractual relationships. There is no evidence whatever as to the reason for the change in language [5] and, as will appear, the, seed thus planted did not ripen into discord for some years.

*Post–Acquisition Events*

*D & B's Initial Concern Regarding Use of the Name*

The first indication of a problem concerning Crowell's continued use of the D & B name appeared in 1978 when Robert S. Diamond, then D & B's senior vice president corporate communications, sent a note to R.D. Simmons, also a senior vice president. Diamond stated:

"Unforeseen to us, it turns out that the use of the Dun & Bradstreet name got sold right along with the T.Y. Crowell deal and puts us in a potentially embarrassing situation whereby the D & B name is being used in such a fashion as the information may not always be under our control." (Metcalf Aff. Ex. E at 75–76 & tab 11)

The note had the predictable effect. Simmons took the matter up with Jerry Raikes, D & B's general counsel. Raikes in turn raised the issue with Buchanan, who had drafted the License Agreement. (*Id.* 75–80) Buchanan then responded to Diamond, stating that the deal contemplated that Harper would have the right to use the D & B name where contractual arrangements existed for revisions, subject to D & B's right to approve any such revisions. (*Id.* tab 12) He went on to acknowledge that he had drafted the License Agreement, but pointed out that it had been "reviewed and approved by the Dun & Bradstreet, Inc. Legal Department before it was executed." (*Id.*)

Diamond responded promptly, inquiring whether the manuscript for the then current *Guide* had been submitted to D & B for review as contemplated by the contract. (*Id.* Ex. E at 80–81 & tab 13) And there the trail ended, at least for the time being. The parties agree that manuscripts were not sub-

---

**5.** Crowell's Fargis was anxious that Crowell retain the right to use the Dun & Bradstreet name following the sale of Crowell to Harper and discussed the subject in the context of the License

Agreement with Crowell's Gillenson and possibly D & B's Mileham. His recollection, however, was extremely vague and sheds no light on this subject. (Metcalf Aff. Ex. D at 40–45)

mitted for D & B's approval until the 1987 edition, and we find that Harper's failure to do so was inadvertent.[6] But Buchanan has no recollection of taking any action in response to Diamond's inquiry. (*Id.* at 81–82)

Although D & B's Diamond appears to have retained a lively interest in Harper's use of the Dun & Bradstreet name (*see id.* tabs 14, 15, 16, 18), nothing of substance transpired between D & B and Harper for years. D & B was well aware that the manuscripts were not sent to D & B in advance of publication, but D & B did not request them and made no issue of Harper's failure. (*Id.* at 91–97 & tab 18) As Buchanan put it, D & B was comfortable with Mr. Hardy (*id.* at 91–97, 107), so no one raised any objection to the lack of pre-publication submission.

*The Change in Authors*

The Crowell–Harper relationship with Hardy, however, changed during this period. For a number of years following the acquisition, Hardy continued preparing the annual manuscript as he had done before. In 1983 and 1984, he entered into new agreements, this time with Harper, providing for him to prepare the 1984 and the 1985 and subsequent editions, respectively. (PTO[7] ¶¶ 1j, 1k; Buchanan Aff. Ex. I, J) The 1984 agreement was terminable by either party on notice for editions subsequent to that for 1985. (Buchanan Aff. Ex. J ¶ 12) It specifically provided that Harper, in the event of termination, "may have materials prepared for any subsequent Annual Edition in any manner and by any party it deems appropriate ..." (*Id.* ¶ 12(b))

Following the 1985 edition, Hardy and Harper reached a parting of the ways. Harper bought out Hardy's royalty rights for $21,000. (Buchanan Aff. Ex. K) It engaged Nancy Dunnan to write the 1986 and subsequent editions of the *Guide.* (PTO ¶¶ 1m–1p)

*D & B Expresses Renewed Concern*

The use of the Dun & Bradstreet name in the title of the *Guide* percolated up again at D & B in 1987 when Steven Boatti, a D & B in-house lawyer who reported to Buchanan, saw a copy of the *Guide* in a bookstore. He raised the matter with Buchanan's boss, Mr. Raikes, who suggested that Boatti have Buchanan look into the contract. (*Id.* tab 19) Boatti in turn wrote a detailed memorandum to Buchanan, noting what he termed "troubling aspects of our name being associated with this book." He copied Buchanan's boss on the memo. (*Id.*)

This bit of apparent corporate politicking seems to have stirred Buchanan. He discussed the matter with Boatti and, at about the same time, appears to have learned that Hardy no longer was the author of the *Guide.* (*Id.* at 99) So he and Boatti fired off a letter to Harper in which they asserted that Harper no longer had the right to use the Dun & Bradstreet name in the title of the *Guide.* The principal argument was that Crowell's revision rights flowed from the 1977 Hardy Contract; since Hardy no longer was the author, they contended, the revision rights had expired. They pointed out also that Harper's rights were contingent upon pre-publication submission and approval of manuscripts, which had not been done. (*Id.* 99–04 & tab 20)

No resolution was reached, although it is undisputed that Harper subsequently submitted all manuscripts in advance of publication. (PTO ¶ 1q; Metcalf Aff. Ex. E at 104, 129) D & B repeatedly commented on the drafts, and Harper repeatedly made changes to accommodate D & B's comments, including the addition of a disclaimer of any responsibility by D & B for the contents of the work. (*E.g.,* Metcalf Aff. Ex. E at 162–63 & tabs 23–24, 27–30, 34–35, 38–40) It is D & B's position, however, that it never "approved" any revision of the book. (*Id.* at 164)

**6.** Carol P. Cohen was editorial director of Harper Reference during the relevant period, and it would have been her responsibility or that of the editor who reported to her to send the manuscripts to D & B. (Cohen Aff. ¶ 2; Metcalf Aff. Ex. H at 11) Ms. Cohen was not aware of the requirement that manuscripts be submitted to D & B in advance of publication. (Metcalf Aff. Ex. H at 11)

**7.** "PTO" refers to the joint pretrial order.

Despite an occasional prod from D & B's Diamond (*id.* at 126–27 & tab 20) and the retention of outside counsel, matters continued to drift for years. Finally, D & B commenced this action in 1993, fifteen years after Diamond first raised a question with Buchanan concerning the use of the Dun & Bradstreet name in the title of the book and six years after Buchanan learned that the book was being written by Dunnan rather than Hardy.

### Discussion

D & B contends that Harper no longer is entitled to use the Dun & Bradstreet name on the *Guide* for two reasons. First, it asserts that Harper breached the License Agreement by failing, until 1987, to submit revisions of the *Guide* to D & B for approval. Second, it argues that Harper has no right to use the name for revisions of the *Guide* by any author other than Hardy. As D & B seeks no relief with respect to Harper's prior use of the Dun & Bradstreet name, the questions are solely prospective in nature.

*Failure to Submit Manuscripts*

Harper arguably breached the License Agreement by using the Dun & Bradstreet name in the title of the *Guide* until 1987 without first having obtained D & B's approval of those revisions, and we so assume for purposes of analysis.[8] Whether one views the failure to secure prepublication approval as the non-occurrence of a condition precedent to Harper's right to use the Dun & Bradstreet name or merely as a breach of the License Agreement, the matter ultimately resolves itself into two closely related questions: (1) whether Harper's failures to obtain approval resulted in the forfeiture of its right to use the name not only on the revisions for which approval was not obtained, but also on all future revisions, and (2) whether D & B's failure to insist on its

right to prepublication review waived or otherwise prevented D & B from taking advantage of those failures.

■ To begin with, we do not think Harper's failure to obtain approval affected its right to use the Dun & Bradstreet name in revisions other than those for which it did not submit manuscripts to D & B.[9] Even if D & B's approval of the manuscripts was a condition precedent to the right to use the Dun & Bradstreet name, the question would remain whether it was a condition precedent only as to the particular revisions in question or to all of the rights granted to Harper.

We find that the parties intended that a failure to obtain approval for a particular revision sacrificed the right to use the Dun & Bradstreet name only for that revision. Indeed, this is obvious from Buchanan's actions during the period 1978 until 1987. Despite being pressed by Diamond about keeping control of the Dun & Bradstreet name, and despite his own knowledge that Harper had not submitted any of the manuscripts for approval, it evidently did not occur to Buchanan that Harper had lost all rights to use the Dun & Bradstreet name in all subsequent revisions. He did not even make a claim as to past failures. Moreover, Harper paid substantial consideration for the acquisition of Crowell, which included the *Guide*. D & B cannot deny that the use of the Dun & Bradstreet name in the title of the *Guide* was valuable, as it urged Crowell to use the name to promote sales notwithstanding that D & B was not in the investment business and had nothing to do with preparation of the work. The conclusion that the use of the name was of substantial value is reinforced by the fact that the parties negotiated specifically with respect to the post-acquisition use of the name in connection with Crowell titles in which it had been used previously. It does

---

8. One might argue that D & B tacitly approved the revisions written by Hardy given the evidence that D & B was comfortable with Hardy and therefore took no action to assert its right to prepublication approval. Given our view of the case, however, nothing turns on whether D & B's actions are properly so characterized.

9. We are mindful of D & B's statement that it did not "approve" even those manuscripts that were submitted to it. D & B, however, does not rely

on its own failure to approve the post–1987 manuscripts, as distinct from Harper's previous failure to submit them. Nor could it have done so successfully in view of the License Agreement provision precluding it from withholding approval unreasonably. The record demonstrates that Harper was entirely cooperative in responding to D & B's reasonable requests for changes and disclaimers.

not stand to reason that a single lapse by Harper to obtain approval would sacrifice all rights, at least absent a specific provision to that effect in the License Agreement.

Equally important, even if the contract had contemplated that Harper's failure to submit one or a number of manuscripts for approval might suffice to cause the loss of all rights to the use of the Dun & Bradstreet name on all future revisions, we hold that the other considerations present here would prevent that result irrespective of how one analyzes the contractual issues as to conditions and breach.

■ The non-occurrence of conditions precedent and breaches of contract may be waived, contractual breaches must be material to justify termination, and termination or rescission on the basis even of material breaches must be sought promptly.[10] Harper's failure to submit the manuscripts for review was inadvertent. D & B's legal department almost surely was aware as early as 1978, and certainly before early 1985, that Harper was using the Dun & Bradstreet name without submitting the manuscripts but made a conscious decision not to raise the issue because, Buchanan says, he was comfortable with Hardy as the author. (Id. Ex. E at 80–82, 91–104 & tabs 13, 18) Indeed, D & B concedes that it learned of several editions between 1978 and 1985. (Pl.Tr.Br. 8)[11] Moreover, there is no evidence that D & B sustained any resulting injury. We find, in consequence, that any breach by Harper was not sufficiently material to justify termi-

nation of its right to use the Dun & Bradstreet name on future editions of the work.[12] We find further that D & B waived any objection to the future use of the name that arose as a result of Harper's failure to submit the manuscripts prior to 1987, whether any such objection arose as a result of the non-occurrence of a condition precedent or a breach of contract by Harper. Hence, D & B may not rely on the pre–1987 failures, however the matter is viewed.

*Alleged Termination of Revision Rights*

■ Having concluded that Harper's failure to obtain D & B's approval for the pre–1987 revisions did not forfeit Harper's rights under the License Agreement, we pass to the central question in the case: what rights, if any, Harper has to use the Dun & Bradstreet name in the title of future revisions of the *Guide.*

D & B's argument may be summarized as follows: Section 1(a) of the License Agreement, according to D & B, granted Crowell the right to revise the *Guide,* among other works, "where a contract between the author and publisher permitting revisions was *in existence* at the time." (Pl.Mem. at 8;[13] Pl.Tr.Br. at 10–11) Paragraph 1(b) permitted publication of reprints or revisions of the then-current *Guide* edition and the use of the Dun & Bradstreet name therewith, subject to D & B's right to approve the revisions. Paragraph 1(c), in D & B's view, provides "that upon the expiration of the revision

---

**10.** *E.g., Septembertide Pub., B.V. v. Stein and Day, Inc.,* 884 F.2d 675, 678–79 (2d Cir.1989) (rescission only if breach material and either wilful or so fundamental as to defeat object of contract); *Canfield v. Reynolds,* 631 F.2d 169, 178 (2d Cir. 1980) (same); *T.G.I. East Coast Constr. Corp. v. Fireman's Fund Ins. Co.,* 600 F.Supp. 178, 181 (S.D.N.Y.1985) (conduct inconsistent with enforcement impliedly waives condition); *Emigrant Ind. Sav. Bank v. Willow Builders,* 290 N.Y. 133, 144, 48 N.E.2d 293 (1943) (waiver by conduct); *Schenck v. State Line Tel. Co.,* 238 N.Y. 308, 313, 144 N.E. 592 (1924) (rescission must be sought promptly); *New York Tel. Co. v. Jamestown Tel. Corp.,* 282 N.Y. 365, 372–73, 26 N.E.2d 295 (1940) (waiver); *Callanan v. Powers,* 199 N.Y. 268, 284, 92 N.E. 747 (1910) (to same effect as *Septembertide* ); *Scalia v. Glielmi,* 200 A.D.2d 614, 606 N.Y.S.2d 722 (2d Dept.1994) (condition waived by conduct).

**11.** "Pl.Tr.Br." refers to trial brief of plaintiff The Dun & Bradstreet Corporation.

**12.** The relationship between the parties with respect to the annual submission and approval of the manuscript is not unlike that of parties to an installment contract. A breach as to a particular installment or installments is a breach as to the whole, and thus gives rise to a right to terminate, only if the breach substantially impairs the value of the entire contract. *E.g. Holford USA Ltd. v. Cherokee, Inc.,* 864 F.Supp. 364, 372 (S.D.N.Y. 1994); N.Y.Unif.Comm.Code § 2–612(3) (McKinney 1993). We decline so to find.

**13.** "Pl.Mem." refers to pretrial brief of plaintiff The Dun & Bradstreet Corporation.

rights, that were incorporated into the License Agreement, i.e., the [1977 Hardy Contract], Harper's license to use the name 'Dun & Bradstreet' would expire." (Pl.Mem. 8–9) Thus, D & B argues that paragraph 1(a) of the License Agreement is the source of, and limits, Harper's revision rights, while paragraph 1(b) authorizes use of the Dun & Bradstreet name in those limited circumstances in which Harper is entitled to revise the *Guide.*

According to D & B, this construction is compelled by the unambiguous terms of the License Agreement. It suggests that any other reading would result in a grant of perpetual rights to use the Dun & Bradstreet name and thus render Section 1(c) meaningless. D & B contends as well that this construction is reasonable in view of the lack of any periodic royalty payments to D & B for use of the name. Finally, D & B contends that it should prevail even if the License Agreement is ambiguous because the parol evidence supports its view.

Harper, not surprisingly, takes a fundamentally different position. It argues that the License Agreement unambiguously provides that Harper is entitled to use the Dun & Bradstreet name in the title of future editions of the *Guide* as long as those editions constitute "revisions" of the edition current at the time the License Agreement was executed. The License Agreement, in Harper's view, does not limit the use of the name to revisions prepared by Hardy. Indeed, since Crowell at all times was the owner of all rights in the book, and since the License Agreement does not limit the number of revisions that Harper is entitled to publish, "it must have been foreseen that Hardy would not always author the book. Accordingly," in Harper's view, "the term 'revisions' must be defined to include substantive changes to the content of the [*Guide*] as well as a change in [its] authorship...." (Def.Mem. at 8) [14]

D & B's assertion that Harper's right to revise the *Guide* flows from paragraph 1(a) of the License Agreement is critical to its argument, as only paragraph 1(a) refers to the 1977 Hardy Contract, which is the linchpin of D & B's argument that Harper's revi-

sion rights have terminated. But the argument flies in the face of the plain language of the License Agreement.

Paragraph 1(a), contrary to D & B's assertion, has nothing whatsoever to do with revisions. Rather, so far as is relevant here, it grants Crowell the right to use the Dun & Bradstreet name in the titles of books that were in print, or were in the process of being printed and published as of the Closing Date, until the inventory was exhausted. In fact, the only mentions of revisions in the License Agreement are in paragraphs 1(b) and 1(c) which, respectively, (i) grant the right to use the Dun & Bradstreet name in the titles of revisions, subject to D & B's approval of those revisions, and (ii) require the removal of the Dun & Bradstreet name from the title of any such books following the expiration of any revision rights. Thus, the source of Harper's right to use the Dun & Bradstreet name in connection with revisions of the *Guide* is not paragraph 1(a) as D & B claims. Where then does Harper's right to revise the *Guide* come from?

■ The 1977–78 and at least some previous editions of the *Guide* were copyrighted by Crowell. (Metcalf Aff. Ex. E, tab 3 [Buchanan Dep. Ex. 3]) A revision of the *Guide,* in normal parlance, would be a new version containing amended, updated and perhaps supplementary material. Section 101 of the Copyright Act defines a derivative work as one based on a preexisting work in which the preexisting work "may be recast, transformed or adapted" and includes a work "consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship...." 17 U.S.C. § 101. Hence, a revision of the *Guide* would be a derivative work within the meaning of the Copyright Act. *See Waldman Publishing Corp. v. Landoll, Inc.,* 43 F.3d 775, 782 (2d Cir.1994).

Section 106 of the Act provides that the owner of a copyright has the exclusive right to prepare derivative works based on the copyrighted work. 17 U.S.C. § 106(2). Crowell as the owner of the copyright in the 1977–78 *Guide,* therefore had the exclusive

**14.** "Def.Mem." refers to defendant's pretrial   memorandum.

right to revise the *Guide*. Accordingly, the exclusive right to revise the *Guide* belonged to Crowell at all relevant times and passed into Harper's sphere by virtue of its acquisition of all of the issued and outstanding shares of Crowell, quite apart from the License Agreement.

Against this backdrop, D & B's fundamental argument—that Harper's right to revise the *Guide* terminated with the 1977 Hardy Contract—makes very little sense. The License Agreement was not the source of those rights to begin with.

What then is to be made of paragraph 1(c) of the License Agreement, bearing in mind that the License Agreement must be construed to give meaning to all of its provisions if that is reasonably possible? This construction does not deprive paragraph 1(c) of independent significance.[15] Since the phrase "rights to revise" the *Guide* refers to the copyright owner's exclusive right to prepare derivative works, Harper's rights to revise the *Guide* will expire with the expiration of the original and renewal term of Crowell's copyright. *See* 17 U.S.C. § 304(a). Moreover, one may not properly ignore the fact that paragraph 1(c) applies not only to the *Guide*, but to a number of other works. It appears that certain rights ʾCrowell had to revise some of those other works might have expired in shorter periods.[16]

This leaves only one remaining issue as to the significance of language in paragraph 1 of the License Agreement, *viz.* the purpose of the final sentence of paragraph 1. That sentence incorporated the list of works as to which Harper received the right to use the Dun & Bradstreet name until existing inventory was exhausted and referred to attached copies of contracts in existence covering the publishing of those books. This, we find, was simply a means of confirming the identities of the books as to which limited rights to use the name were granted and a representation by D & B that there were no contracts covering the publication of those books other than those attached.

In sum, Harper, by virtue of its acquisition of all of the issued and outstanding shares of Crowell and the License Agreement, has the exclusive right to revise the 1977–78 and prior editions of the *Guide* copyrighted by Crowell and the right to use the Dun & Bradstreet name in the title of such revisions, subject to obtaining D & B's approval of each revision, until the expiration of the rights to revise the 1977–78 *Guide*.

In view of this analysis, we conclude that the License Agreement unambiguously requires the foregoing conclusion. "[C]ontract ambiguity is not established simply because the parties disagree as to the meaning of a particular provision." *United States v. 0.35 Of An Acre Of Land*, 706 F.Supp. 1064, 1070 (S.D.N.Y.1988) D & B's interpretation "suspend[s] the rules of common English usage," "ignore[s] the conventions of [the] commercial setting," and therefore may not "create an issue where none exists." *Ward's Co. v. Stamford Ridgeway Associates*, 761 F.2d 117, 120 (2d Cir.1985). In consequence, it would be inappropriate to consider the parol

---

**15.** Any contention that this construction would deprive paragraph 1(b) of meaning would be mistaken. Paragraph 1(b) contains an assignment by D & B to Crowell of, *inter alia*, all of its rights in and to the *Guide*, including its rights to revise that work. D & B might argue that this assignment would be meaningless if "rights to revise" referred to the copyright owner's exclusive right to prepare derivative works because the right to revise came along with the Crowell stock independent of the License Agreement. But that argument would ignore the general caution of corporate counsel in transactions of this nature.

Crowell had been under D & B ownership for several years prior to Harper's acquisition. Careful counsel would have wished to be certain that Harper acquired not only whatever literary

property Crowell owned in the *Guide* but any interest that D & B owned as well. Paragraph 1(b)'s assignment of all of D & B's rights in and to the *Guide* therefore served in effect as a quitclaim deed, insuring that no one tracing his or her title back to D & B later could claim any interest in the literary property in the *Guide*. Indeed, D & B's counsel acknowledged in his closing argument that D & B had no rights to revise the *Guide* and himself characterized paragraph 1(b) as a quitclaim deed.

Thus, the assignment of D & B's rights to revise the *Guide* contained in paragraph 1(b) would not be rendered meaningless by construing the phrase "rights to revise" as referring to the ownership of copyright in the 1977–78 *Guide*.

**16.** *See* 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §§ 3.01, 3.06, 3.07[B] (1994).

evidence proffered by D & B. Consideration of those matters, however, would not alter the result.

D & B contends that parol evidence establishes that D & B did not wish the Dun & Bradstreet name to be associated with the *Guide* and other publications following the sale of Crowell, while Harper took the opposite position. The parties, according to D & B's Buchanan, compromised, and D & B granted a limited right to use the name. (Buchanan Aff. ¶¶ 6–19) The difficulty with the argument is threefold.

First, in view of Buchanan's testimony concerning his role in and knowledge of the acquisition negotiations, we doubt the extent of his personal knowledge.

Second, Buchanan's account is consistent with the language of the LOI, but it is inconsistent with the plain language of the License Agreement. Buchanan prepared the LOI, which reflected the deal he now claims was struck. He then prepared the License Agreement, which obviously differed in material respects. That difference can be accounted for only by mistake or a change in the deal. Mistake must be ruled out because D & B does not seek reformation on grounds of mistake or otherwise suggest that the License Agreement does not contain the parties' agreement. Thus, we find that the change in language from the LOI to the License Agreement was deliberate and not a scrivener's error by Buchanan. But Buchanan does not even attempt to account for the change, behaving instead as if it had not occurred.

Third, we are mindful of the time honored principle that the interpretation of contracts is governed by the *expressed* intention of the parties.[17] The critical parts of Buchanan's account, however, consist of his necessarily interested interpretations of the contractual language, devoid of any evidence that Harper was aware of or shared those interpretations.

Accordingly, even if we considered the parol evidence, we would not find that the intention of the parties was that claimed by D & B.

Nor are we impressed with D & B's argument that this result is incongruous because a perpetual or long term license to use the Dun & Bradstreet name would have carried a royalty, whereas the License Agreement is royalty free. D & B, however, ignores the fact that the License Agreement does not stand alone. It was an integral part of an acquisition with a multimillion dollar price tag. D & B could well have been compensated for the use of its name, either on a temporary or long term basis, as part of the purchase price for Crowell and Conklin. D & B has submitted no contrary evidence.

For all of the foregoing reasons, then, we hold that the termination of the 1977 Hardy Contract did not end Harper's right to use the Dun & Bradstreet name in the title of revisions of the *Guide*.

*The Scope of Harper's Rights*

■ The fact that Harper's right to use the name did not end with the 1977 Hardy Contract is not necessarily the end of the matter. The right to use the Dun & Bradstreet name extends, under the License Agreement, only to revisions of the 1977–78 edition of the *Guide*. (License Agreement ¶ 1(b)) It stands to reason, moreover, that changes in circumstances at some point will require, if they have not already required, changes in the *Guide* sufficient to make it a new work, rather than a revision. At that point, Harper would not have the right to use the Dun & Bradstreet name in the title of the new work. That point, however, need not now be decided.

Although D & B appears initially to have contended in this action that recent annual editions of the *Guide* were not "revisions" within the meaning of the License Agreement, it abandoned that argument prior to trial (Metcalf Aff. Ex. C; Pl.Tr.Br. *passim* ),

---

17. *Hotchkiss v. Nat. City Bank of New York*, 200 F. 287, 293–94 (S.D.N.Y.1911) (L. Hand, J.), *aff'd sub nom. Ernst v. Mechanics' & Metals Nat. Bank of the City of New York*, 201 F. 664 (2d Cir.1912), *aff'd sub nom. Nat. City Bank of New York v. Hotchkiss*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913); *Mencher v. Weiss*, 306 N.Y. 1, 7–8, 114 N.E.2d 177 (1953); *Ahern v. South Buffalo Ry.*, 303 N.Y. 545, 561, 104 N.E.2d 898 (1952); *Porter v. Comm. Cas. Ins. Co.*, 292 N.Y. 176, 184, 54 N.E.2d 353 (1944).

a point confirmed by D & B's counsel on closing argument. In this case, it seeks only prospective relief. Thus, its position is that Harper no longer has any right to use the Dun & Bradstreet name on *any* new version of the *Guide*, irrespective of whether the new version is a "revision" of the 1977–78 edition. As D & B has failed to demonstrate that Harper's rights to use the Dun & Bradstreet name in the title of revisions of the *Guide* have terminated, the complaint must be dismissed. The Court therefore has no occasion to consider whether some future edition of the *Guide* is a "revision" within the meaning of the License Agreement, a matter which may abide the necessity for its resolution.

SO ORDERED.