**BEAR U.S.A., INC., Plaintiff,**

v.

**A.J. SHEEPSKIN & LEATHER OUTERWEAR, INC., et al., Defendants.**

**No. 95 Civ. 8146.**

United States District Court, S.D. New York.

Nov. 22, 1995.

Stevan J. Bosses, Pasquale A. Razzano, Daniel Chung, Timothy J. Kelly, Fitzpatrick, Cella, Harper, & Scinto, for Plaintiff.

Jordan S. Weinstein, Law Offices of Jordan S. Weinstein, Martin B. Pavane, William A. Alper, Cohen, Pontani, Lieberman & Pavane, for Defendants.

## OPINION

KAPLAN, District Judge.

"From time far older than memory, the bear has been a special being: humanlike, yet close to the animals and hence to the source of life....

"[O]ur long association with the bear seems imprinted in daily language, religion, literature, folklore, fairy tales, place names, toys, plant and food names, even surnames. As a stuffed-toy companion, as a family in 'Goldilocks,' and as the forest

ranger 'Smokey,' the bear remains alive in the popular imagination."[1]

It therefore is not surprising that plaintiff, which has achieved dramatic success in marketing clothing under a trademark consisting of the word "Bear" or the phrase "Bear U.S.A." in conjunction with a drawing of a polar bear, seeks a preliminary injunction restraining defendants from the use of confusingly similar marks on competing or closely related garments.

As defendants deliberately have sought to confuse the public and trade on plaintiff's success, the motion is granted except as to certain distinct types of clothing as to which plaintiff delayed unduly in seeking preliminary relief.

*Facts*

*The Origin and Background of Plaintiff's Mark*

Plaintiff Bear U.S.A., Inc. ("Bear USA"), is a concern owned by the Hong family, which has been in the clothing and footwear business for more than eight years. (T. Hong Decl. ¶¶ 1–3; R. Hong Decl. ¶ 1) The family business initially was run by Thomas Hong, but day to day operations now are overseen by Robert Hong, his son, as Thomas Hong is seriously ill. (R. Hong Decl. ¶ 5)

K.P. Original Corporation ("KPO"), a retail and wholesale store located at 3535 Broadway in Manhattan, was an early, and perhaps the original, Hong venture in the clothing business. In 1993, however, KPO began importing and selling outerwear to retailers in the United States. (T. Hong Decl. ¶ 4; Cpt. ¶¶ 9, 14) The goods were designated by trademarks using one or another variation involving the word "bear." (T. Hong Decl. ¶ 4; Cpt. ¶ 9)

As the Hongs' importing business grew, they formed plaintiff Bear USA, which has been importing and marketing outerwear—down-filled parkas, jackets and boots—since 1993 under the Bear name. (T. Hong Decl. ¶ 4; Cpt. ¶ 9) The trademarks employed have consisted of a line drawing of a polar bear in conjunction with either the word "Bear" or the phrase "Bear USA" and certain variations thereof. (T. Hong Decl. ¶ 4)

Bear USA uses the services of Urban Sales & Associates ("Urban"), a manufacturers' representative the principals of which are Steven Schneider and Malcolm Forst. Urban markets the products of Bear USA and five other manufacturers on a commission basis to retailers worldwide. Neither Urban nor its principals are employees of Bear USA. (Tr.[2] 58)

Plaintiff's efforts have met with remarkable success. Domestic sales of plaintiff's Bear products exceeded $1 million in 1994. (T. Hong Decl. ¶ 9) By the time this motion was filed, they had exceeded $6 million thus far this year, approximately half in the United States and half in Japan. (*Id.*)

The Hongs have advertised extensively, spending tens of thousands of dollars on advertising and promotion in 1995 alone. (Cpt. ¶ 15; *see also* T. Hong Decl. ¶ 5) Their Bear products have won praise and attention from retailers and fashion magazines. For example, the advertising director for *The Source* magazine attested, "We see many companies come and go in the fashion outerwear business, but we all feel very strongly that Bear U.S.A.'s attention to detail and quality will keep you guys head-and-shoulders above the rest of the pack." (T. Hong Decl. Ex. 7) The detail and quality referred to include high quality down fill and stitching in the jackets and parkas as well as the use of high grade leather, waterproof Gore Tex® linings, and specific brands of insulation in and soles on boots. (Cpt. Ex. B; T. Hong Decl. ¶ 15) Moreover, Macy's commended plaintiff for their "outstanding sell thrus" in 1994, designated plaintiff a "major vendor" for 1995, and planned to open a section devoted to plaintiff's products called "The Bear Shop" in the Macy's at Herald Square. (*Id.* ¶ 8, Ex. 2) Recently, GQ magazine featured a "jacket by Bear" in a model's ensemble. (R. Hong Dec. Ex. 5)

---

1. PAUL SHEPARD AND BARRY SANDERS, THE SACRED PAW: THE BEAR IN NATURE, MYTH, AND LITERATURE xi (1985); *see also* DAVID ROCKWELL, GIVING VOICE TO BEAR (1991).

2. Unless otherwise indicated, "Tr." refers to the transcript of the November 17, 1995 evidentiary hearing.

Given the success of plaintiff's efforts, plaintiff not surprisingly intends to expand its product line. It has been engaged in a dialogue with at least one sportswear retailer about licensing the Bear marks for denim and active wear.[3] (T. Hong Decl. ¶ 16 & Ex. 5; Tr. 42–43)

On February 9, 1995, plaintiff obtained New York State registration for the word "Bear" combined with the polar bear logo to be used "in connection with parkas and jackets." (Cpt.Ex.D; T. Hong Decl. ¶ 18) It has four pending federal trademark applications, which have been published in the Trademark Official Gazette.[4] (Cpt.Ex.C; T. Hong Decl. ¶ 17) Two of these applications are for the word "bear" and two for the words "Bear U.S.A., Inc.," in each case combined with the polar bear logo, one in each case for use in connection with "clothing, namely sweaters, sweatshirts, T-shirts, pants, jeans, shorts, hats, caps, gloves and headbands, and footwear" and the other for "parkas and jackets." (Cpt. Ex. C)

*Defendants' Adoption and Use of "Bear" Marks*

The defendants in this case are A.J. Sheepskin & Outerwear, Inc. ("AJ"), Inner City Jeans & Sportswear, Ltd. ("Inner City"), and their principals, Theodore Held and Simon Akiva, respectively.

The defendants have marketed, and continue to market, a variety of clothing products under several brand names, including Mondiora, Paolo Gucci,[5] and 20 Below. They have places of business in the Bronx and appear to import clothing from abroad and sell it to retailers and end users in this country. They are no strangers to litigation of this sort, having been enjoined previously from infringing marks owned by two other popular clothing manufacturers, North Face and Guess?. (Pl. Mem. Exs. 1, 2)

The defendants have known the Hongs and been aware of their efforts and success. When the Hongs first began selling clothing under a trademark using the word "bear," AJ and Inner City were among their customers, buying over $180,000 worth of jackets and parkas. (T. Hong Decl. ¶ 20 & Ex. 6) After seeing the Hongs' remarkable success with the Bear mark (Tr. 109), defendants decided to bring out denim jeans under a similar name. The Court finds that the decision was intended to capitalize on the Hongs' success.

The defendants began taking orders for jeans, which they called "Bear Jeans," in January 1995, but did so in an unusual manner. Whereas garment manufacturers and importers typically introduce new lines at widely attended trade shows held at various times through the years, the defendants in January 1995 began showing samples to, and seeking orders from, retailers who came to their Bronx warehouses. (*Id.* 116–117) Although they had a booth at the Magic show, one of the widely attended industry events, in February 1995, they did not show the Bear Jeans there.[6] (*Id.*)

The circumstances in which the defendants' Bear Jeans jeans first became more widely known are not entirely clear.

The defendants began delivering Bear Jeans jeans to retailers on March 13, 1995.[7]

---

3. Active wear and sportswear refer to jeans, shirts, and sports clothing. They are to be distinguished from parkas, jackets and boots, which are referred to as outerwear.

4. After a PTO examiner has determined that the applicant complied with formalities and the mark is registrable, the PTO publishes the mark. If the registration is not successfully opposed, the PTO will issue a notice of allowance. The average time from the filing of an application for registration to the issuance of a Notice of Allowance is 14.5 months. 2 McCarthy on Trademarks § 19.40[1], at 19–214 to 19–215 (3d ed. 1995) [hereinafter McCarthy on Trademarks].

5. The defendants have no relationship with, and have no license from, the proprietors of the world famous Gucci trademark. (*See* T. Hong Decl. Ex. 2)

6. Theodore Held sought to explain this at the evidentiary hearing by contending that the defendants' samples were not ready, as they had expanded the line and changed the styles from those used in the initial solicitation of orders. (Tr. 117) The Court need not at this stage determine the credibility of that explanation. The material point, for present purposes, is that the defendants' early activities were not known to the Hongs or, indeed, widely known in the trade.

7. Theodore Held so testified during the hearing. (Tr. 110) At another point, he claimed that some deliveries were made as early as January. (*Id.*

They claim they first showed the product to the trade at the NAMSB show held at the Javits Center in New York City on March 19–22, 1995, although it appears even on their version that these products were only a modest part of their overall display. (Tr. 95) The other events of that late March time period are matters of dispute.

Theodore Held testified that he and his associates met with Schneider and Forst in a van outside the NAMSB show and that Schneider and Forst then indicated that they had seen Bear Jeans jeans and were "upset" because they wanted to represent the defendants' line. (*Id.* 96) They allegedly expressed the hope that the Hongs and the defendants would reach an agreement that would enable Urban to represent both lines. (*Id.*) Shortly thereafter, according to Held, Forst and Schneider met with Akiva and Theodore and Harvey Held at the Elmont Mart and again expressed their desire to represent defendants' line. (*Id.* 101)

Schneider told a markedly different story. He acknowledged visiting the defendants' booth at the NAMSB show, but testified that he saw nothing with any "bear" designation. (*Id.* 59) According to Schneider, defendants there took the initiative and asked that he set up a meeting with the Hongs because defendants said they wanted to discuss licensing the Bear mark. They warned, however, that they were likely to go ahead with use of a "bear" mark whether or not plaintiff granted a license. (*Id.* 60)

Based on the Court's assessment of the credibility of the witnesses and the other evidence of record, it finds that defendants had Bear Jeans jeans at their booth at the NAMSB show, but that Schneider did not see the product and, in any case, did not report having seen it to plaintiff. Both Held and Urban expressed a desire to work out an arrangement between the defendants and the plaintiff, and Urban certainly wished to represent both lines. Held, moreover, did convey the threat that the defendants might go forward with use of a "bear" mark in an effort to induce the plaintiff to license the mark for use on denim jeans and perhaps other products. Held's strategy was to coerce the plaintiff to grant a license by threatening disruption of plaintiff's marketing efforts and the expense and trouble of litigation.

These meetings between defendants and Urban led to a dinner meeting in New Jersey in late March attended by the Helds, Akiva, and Robert Hong, who agreed to the meeting in view of the threat conveyed to him through Urban. (R. Hong Decl. ¶ 7; Tr. 12–13) Hong indicated that he had heard of the defendants' desire to license the mark, but told them that the Hongs had decided to keep "Bear" for the Hong family. (Tr. 38) Although they did not indicate the goods on which they intended to use "bear" or the exact nature of the proposed mark, the defendants said that they were aware that plaintiff had registered its mark only for outerwear and footwear and threatened to go ahead without a license. (*Id.* 44) Hong responded that plaintiff had the registration and that its lawyers knew what they were doing. (*Id.*)

By the time the dinner meeting ended, plaintiff knew that the defendants were threatening to use some version of a mark involving the word "bear," probably on sportswear or active wear, but did not believe they were likely to do so on outerwear or footwear. (*See id.* 41–42) Hong testified that he was suspicious of the defendants, but that he was confronted at that point with nothing more than a threat (*id.* 43), and the Court credits that testimony.[8] The defendants, on the other hand, were fully aware that the Hongs had no intention of licensing them, objected to any use by them of a mark involving the word "bear," and probably

---

129) Given the certainty with which Held initially adhered to the March 13 date when pressed, and given the Court's overall assessment of his credibility, the Court finds, for purposes of this motion, that the first deliveries were on March 13.

**8.** Defendants sought to establish that Hong saw Bear Jeans jeans and perhaps a reflector jacket with a "bear" mark at AJ's warehouse when he visiting in late March to pick up a check. (Tr. 91–92; Held Decl. ¶¶ 45–46) Hong denied having seen any such products on that occasion, and the Court credits his denial. (Tr. 6; R. Hong Decl. ¶ 6)

would resort to legal action in the event defendants carried out their threat.

To date, defendants have used the the "Bear Jeans" mark on jeans, shirts, and light jackets and the phrase "Bear Tex by Bear Jeans" on down jackets. (Held Suppl. Decl. Exs. GG–JJ, MM, OO; Cpt. Ex. FF; DX JJ, PX 1)[9] In at least one instance, defendants used the mark "Bear Jeans" along with the word "U.S.A." and a frontal picture of a polar bear on a shirt label. (T. Hong Suppl. Decl.Ex. 2; PX 3) Defendants use the words "Bear Tex" with a smaller notation of "Bear Jeans" on boots. (Held Suppl. Decl.Exs. BB–CC)

*Plaintiff's Discovery of Defendants' Activities*

There is conflicting evidence about what plaintiff knew and when it knew it as events transpired during the ensuing months.

According to defendants, retailers with stores in close proximity to KPO began receiving Bear Jeans jeans and displaying them in their show windows toward the end of March 1995. (Tr. 69, 95) They contend that at least one KPO employee went into one of those stores and specifically commented on the product. (*Id.* 70)

Robert Hong and Schneider, on the other hand, denied having seen any Bear Jeans jeans anywhere before June 1995, and Hong testified that even then he did not know that defendants were the source. (*Id.* 14, 61) Hong acknowledged, however, that he saw shirts with a "bear" mark in July or August and light jackets[10] in August and that he heard that defendants displayed light jackets, shirts and jeans with "bear" marks at another trade show held in Las Vegas in the second or third week of August 1995. (*Id.* 15–16) Hong said that he first heard that defendants were selling boots with a "bear" mark after the International Jeanswear show in New York in mid-September 1995. (*Id.* 17–19) A private investigator informed Hong that defendants distributed a price

sheet entitled "Bear Line '95" and listing down parkas at the September show; the investigator, however, saw no samples of down parkas with a bear label at defendants' booth. (R. Hong Decl. ¶ 12; *see also* Cpt. Ex. G; Tr. 19–20) The Hongs maintain that it was not until November 3 that they successfully obtained one of defendants' down parkas to confirm their existence. (R. Hong Decl. ¶¶ 12–13; T. Hong Decl. ¶¶ 3, 5; Tr. 20)

Having considered all the evidence, the Court finds that plaintiff first learned in April 1995 that Bear Jeans jeans were on the market, by July or August 1995 that shirts with a "bear" mark were in the market, and by August that light jackets with a "bear" mark were in the market, immediately suspecting in each case that the defendants were the source of these products. Plaintiff confirmed that defendants were the source of the jeans in or about June 1995, promptly confirmed that they were the source of the shirts, and confirmed that they were the source of the light jackets no later than the third week of August 1995. Plaintiff discovered that defendants sold boots under a "bear" mark in mid-September and at that point believed that defendants were selling jackets or parkas, but plaintiff did not confirm defendants' sales of down jackets with a "bear" mark until November 3.

*Prior Proceedings*

Plaintiff commenced this action on September 25, 1995 after learning that defendants' had expanded the line on which they were using "bear" marks to outerwear, the heart of plaintiff's business. It filed this motion for a preliminary injunction on October 16, 1995.

Following the submission of defendants' answering papers, the Court held a conference with counsel on November 7, 1995. Each side stated that it did not wish an evidentiary hearing on the motion. (Tr., Nov. 7, 1995, at 4–5) At the Court's suggestion, both sides subsequently agreed that a

---

**9.** "PX" and "DX" refer, respectively, to plaintiff's and defendants' exhibits marked for exhibits marked or received at the evidentiary hearing.

**10.** The light jackets referred to are a different style and for a different season than plaintiff's

heavier down jackets. The Court finds that the jackets sold by defendants, as distinguished from their more recently introduced down products, are not competitive with plaintiff's parkas and coats.

prompt trial would be preferable to motion practice and the trial was scheduled to begin on November 30, 1995. (*Id.* 8–9)

On November 8, 1995, counsel for defendants sought to be relieved of his agreement to proceed immediately to trial. Citing an alleged need to investigate thirty non-party witnesses to establish third-party use of marks including the word "bear," counsel sought postponement of the trial but suggested instead that plaintiff's motion for a preliminary injunction be reinstated without delay. At a further conference with counsel, the Court agreed to the postponement of the trial and granted plaintiff's request for a brief extension of time to complete its reply papers in support of the motion.

On November 13, 1995, notwithstanding the parties' waiver of an evidentiary hearing, the Court scheduled a hearing for November 17, 1995, principally to take testimony concerning the timing of the action, i.e., what plaintiff knew and when it knew it.[11] Notwithstanding their previous waiver of a hearing and their consent to reinstatement of plaintiff's motion without delay, defendants on November 16, 1995 sought an adjournment of the hearing for the purpose of conducting discovery in connection with the motion. The application was denied and the hearing went forward. (Tr. 2–3) The Court heard testimony from Robert Hong, Theodore Held, Steven Schneider and two retailers, Hassan Faour and Kemal Kahlil. It also accepted, with plaintiff's agreement, proffers of the testimony of two other retailers put forward by the defendants.

### Discussion

■ In order to obtain a preliminary injunction, plaintiff must establish a threat of irreparable injury and either (a) a likelihood of success on the merits, or (b) the existence of serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in plaintiff's favor. *Church of Scientology v. Elmira Mission of The Church Scientology,* 794 F.2d 38, 41 (2d Cir.1986); *Arrow United Industries Inc. v. Hugh Richards, Inc.,* 678

F.2d 410, 413–14 (2d Cir.1982); *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78 (2d Cir.1981); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir.1979).

■ Under the Lanham Act, a probability of confusion is a key factor in determining the plaintiff's likelihood of success on the merits and "almost inevitably establishes irreparable harm" for purposes of issuing a preliminary injunction. *Church of Scientology,* 794 F.2d at 41; *see also Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 78 (2d Cir. 1988) (stating that "a showing of a likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm"). However, if the party seeking a preliminary injunction has delayed unduly, the delay may undercut the presumption of irreparable harm and serve as a basis for denying a preliminary injunction. *E.g., Citibank N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985). Given the interplay between irreparable harm and the essence of a Lanham Act violation, probability of confusion, it is appropriate to begin by examining plaintiff's likelihood of success on the merits before the other requirements for a preliminary injunction.

### Likelihood of Success

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits "false designation of origin" in relation to goods and services. This section protects both registered and unregistered marks, as "[i]ts purpose is to prevent consumer confusion regarding a product's source" and to enable manufacturers to differentiate their marks from others in the marketplace. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1220 (2d Cir.1987).

■ A plaintiff whose trademark is not federally registered must satisfy two elements to obtain protection under the Lanham Act: (1) use of a protectible mark, and (2) a likelihood of consumer confusion as to the source of the mark. *Id.* at 1221; *Thomp-*

11. The order, dated November 14, 1995, specifically advised the parties that the Court would entertain testimony on other issues consistent with the need for a prompt disposition of the motion.

*son Medical Co., v. Pfizer Inc.,* 753 F.2d 208, 216–18 (2d Cir.1985).

### Protectibility of Plaintiff's Mark

Plaintiff's bear marks are protectible because they are suggestive and, alternatively, because plaintiff is likely to establish that they have acquired secondary meaning.[12]

■ A mark is suggestive if it requires "imagination, thought, and perception to reach a conclusion as to the nature of the goods." *Thompson Medical Co.,* 753 F.2d at 213. The word "bear," especially in conjunction with the image of a polar bear, is connected with the concept of cold weather and protection from the elements. It suggests that the type of outerwear and boots sold by plaintiff offer the sort of protection afforded by bears' skins. The imagination and thought process involved in this mental association supports the conclusion that plaintiff's bear marks are suggestive, particularly as used in connection with boots and cold weather outwear. *Cf.* 1 MCCARTHY ON TRADEMARKS § 11.21[2], at 11–09 (other examples of suggestive marks include SPARKLE for window cleaner, PENGUIN for food freezers, SAMSON for weight training machines, and VENUS for beauty salons). Hence, the Court concludes that plaintiff's bear marks are suggestive and therefore protectible without proof of secondary meaning.

■ Even if not suggestive, plaintiff's bear marks qualify for protection because plaintiff is likely to establish that its marks have acquired secondary meaning, i.e., have come to identify a particular source of the goods in the minds of the consuming public, *Centaur Communications,* 830 F.2d at 1221. Determining whether a mark has acquired secondary meaning involves considering factors such as (1) advertising expenditures, (2) sales success, (3) copying, (4) length and exclusivity of the use, and (5) consumer associations between the mark and source of the product. *Id.,* 830 F.2d at 1221–25.

The conclusion that plaintiff's bear marks probably have acquired secondary meaning is based primarily on plaintiff's continuous use of the mark since 1993, plaintiff's advertising, the third party recognition of plaintiff's products, and plaintiff's sales success. The letter from a Macy's official commending plaintiff for their "outstanding sell thrus in 1994" (T. Hong Aff. Ex. 2), as well as the sales data, suggest that the acquisition of secondary meaning by plaintiff's mark preceded defendants' use of its mark, as required by *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1043 (2d Cir.1980). Defendants' admission that plaintiff began enjoying the success of its Bear marked products as early as 1993, more than a year before defendants launched their line of bear mark products (Tr. 109), further supports the conclusion that plaintiff's mark probably acquired secondary meaning before defendants began using it,[13] as does the persuasive evidence of copying of plaintiff's mark by defendants, which is discussed in detail below.[14]

---

**12.** Eligibility for federal trademark protection varies depending on whether the mark is considered (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary and fanciful. *Thompson Medical Co.,* 753 F.2d at 212 (citing the origins of this categorization in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976)). A generic term or symbol is ineligible for protection. A descriptive mark is protected only upon a showing of secondary meaning, whereas suggestive and arbitrary or fanciful marks are protected without any showing of secondary meaning. *Id.* at 212–13.

**13.** Consequently, this case is readily distinguishable from *PaperCutter Inc. v. Fay's Drug Co.,* 900 F.2d 558, 565 (2d Cir.1990). In that case, defendant opened its first store using the disputed trade name on the same day that plaintiff shipped its first order of goods to a buyer from a trade show—circumstances conferring such a slight priority of use that plaintiff could not have established secondary meaning at the relevant point in time. Here, plaintiff enjoyed far more than a slight priority of use.

**14.** Defendants argue that the use by third parties of marks involving the word "bear," or a picture of a bear, casts doubt on plaintiff's claim of exclusive ownership and raise the question of fraudulent copying by plaintiff.

The evidence offered by defendants to support this argument is frivolous or unimpressive. For example, the use of the word "bears" in connection with sportswear licensed by or under the authority of the Chicago Bears football team is thoroughly unlikely to cause confusion about the true source of those or plaintiff's products. (*See* Malone Decl. Exs. U–2, X–2, Y–2) The use of a polar bear picture on boots by Sorel does not appear likely to cause confusion because the

*Likelihood of Confusion*

■ In evaluating whether a likelihood of confusion exists, courts in the Second Circuit are guided by the familiar *Polaroid* factors: (1) strength of the senior user's mark; (2) degree of similarity between the marks; (3) proximity of the products; (4) likelihood that the senior user of the mark will bridge the gap; (5) evidence of actual confusion; (6) defendants' bad faith; (7) quality of defendants' products; and (8) sophistication of the relevant consumer group. *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). This list is not exhaustive, and no one factor is determinative. *Nikon, Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir.1993).

Weighing these factors points strongly to a likelihood of confusion.

*(1) Strength of the Mark*

First, the plaintiff's mark is strong. The mark is suggestive and in any case probably has acquired secondary meaning. Plaintiff's mark has grown even stronger since the time period critical to the showing of secondary meaning. In 1995, Macy's designated plaintiff a "major vendor" and planned to specify a section of floor space to plaintiff's clothing products, called "The Bear Shop," at Macy's Herald Square. (T. Hong Decl. ¶ 8; Ex. 2) The recent feature of one of plaintiff's down jackets in GQ magazine, with the description "jacket by Bear" (R. Hong Decl. Ex. 5), attests further to the success of plaintiff's products and significance of the mark to the public.

*(2) Similarity of the Marks*

■ There is significant similarity between plaintiff's and defendants' marks, the most obvious being the use of the word "bear." Although the labels on defendants' products also use the word "Jeans" or "Tex," the word "Bear" constitutes the most prominent feature. In the photograph of their jackets submitted by defendants, the letters in the word "Jeans" are tiny and spaced in between the far larger letters of the word "Bear." (Held Decl. Ex. GG).[15] As for the mark used on defendants' boots, the addition of "Tex" to "Bear" has no independent meaning, except perhaps to connote the material Gore Tex®, which is used in plaintiff's boots. (*See id.* Ex. CC)

Whatever the differences between the two marks (including plaintiff's use of the polar bear logo on labels), the main impression left on the viewer in each case is of a manufacturer named "Bear." *Cf. McGregor–Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1134 (2d Cir.1979) (finding that sufficient demonstration of likelihood of confusion exists "if the *impression* which the infringing product makes upon the consumer is such that he is likely to believe the product is from the same source" as the one the consumer knows) (italics in original, citation omitted).

Moreover, plaintiff has demonstrated that defendants have used their imitations of plaintiff's mark in a manner that enhances rather than reduces the likelihood of confusion. For example, plaintiff and defendants both manufacture parkas in identical shades of yellow and black. Defendants placed four labels on their parka in the same, or nearly identical, places as on the plaintiff's comparable product: a round patch containing the word "bear" on the right arm, the word "bear" embroidered in white thread beside the zipper, the word "bear" inside a horizontal stripe on the left breast of the jacket, and a "bear" label inside the neck collar. (*Compare* PX 1 with PX 2) Another instance of added similarity is the label on one of plain-

---

dominant identification of that product is by the name "Sorel." (R. Hong Decl. ¶ 18, *accord*, Held Decl. ¶¶ 22–23). The Court has serious questions about whether other alleged users of a bear mark are actively using them, using them in a manner that it as confusingly similar, or are senior users with superior rights to the mark. In fact, one of the third party users alleged by defendant has received a letter by plaintiff informing it that the use is an infringement. (T. Hong Suppl. Decl. ¶ 7 & Ex. 3)

Accordingly, the evidence of third party use of confusingly similar bear marks is so thin as not to warrant conclusions other than those reached here.

**15.** Indeed, in the pictures submitted in the complaint, the word "Jeans" does not stand out as legible and, for that matter, is barely detectable. (Cpt. Ex. F)

tiff's shirts, which states, inside the neck collar, "Bear Jeans U.S.A." with a frontal picture of a polar bear. PX 3; T. Hong Supp. Decl. Ex. 2) The addition of U.S.A. and the polar bear seek to confuse consumers in a not-so-subtle way.

### (3) Proximity of the Products

■ The third *Polaroid* factor is the proximity of the products. Inquiry into the proximity of the products "focuses on whether the two products compete with each other." *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 582 (2d Cir.1991). To the extent that the goods "serve the same purpose" or "fall within the same general class," the use of similar marks is more likely to cause confusion. *Id.*

Here, the parties both sell parkas, jackets, and boots, thereby competing in precisely the same market for the same customers and heightening the risk of confusion. The pants and shirts do not compete directly, but because they are casual clothing, fall into to the category of related products. This Court long has recognized "trademark owner's rights against use on related, non-competing products." *Scarves by Vera, Inc., v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1172 (2d Cir.1976) (and cases cited therein).

### (4) Likelihood of Bridging the Gap

■ Defendants, but not plaintiff, currently sell jeans and shirts, thus implicating the fourth *Polaroid* factor—the likelihood that the senior user, plaintiff, will bridge the gap. Plaintiff intends to expand into jeans and shirts and has presented evidence of dialogue with a clothing manufacturer about the prospect of producing jeans and active wear under plaintiff's licensed mark. (T. Hong Decl. ¶ 16 & Ex. 5) In addition, two of plaintiff's four pending federal trademark applications, which have been published in the Trademark Official Gazette, seek registration in connection with jeans, sweatshirts, T-shirts, pants, and shorts. (Cpt.Ex. C) This evidence collectively demonstrates plaintiff's intent to bridge the gap. Plaintiff's plan to enter the shirt and pants market is significant not only because its strengthens the likelihood of confusion, but also because the federal trademark law protects the senior user's interest in being able to enter a relat-

ed field at some future time. *Scarves by Vera*, 544 F.2d at 1172.

### (5) Actual Confusion

■ The plaintiff is not required to prove the fifth *Polaroid* factor, actual confusion, in order to prevail, although its presence helps. *Hasbro*, 858 F.2d at 78. The absence of such proof "is not especially significant," however, in cases in which the products have been competing for only a short period of time. *Centaur Communications*, 830 F.2d at 1227 (absence of proof of actual confusion not significant considering that the products were competing for only four months before trial). While the evidence of actual confusion is not great, the little that exists favors plaintiff. Some of plaintiff's employees have reported that customers asked at KPO's store for jeans under the Bear name. (T. Hong Decl. ¶ 27) Although ambiguous, this evidence suggests possible actual consumer confusion over whether plaintiff, rather than defendant, is the source of the clothing marketed under defendants' mark. This factor probably cuts modestly in plaintiff's favor; it is no worse for plaintiff than neutral.

### (6) Defendants' Bad Faith

■ The sixth factor, defendants' bad faith in adopting its mark, is clear. Plaintiff sold clothing under its bear mark before defendants. After seeing and· themselves selling plaintiff's products, defendants sought to join in business with plaintiff, but plaintiff refused and warned that plaintiff's lawyers would protect the mark. Following plaintiff's refusal, defendants marketed the same kinds of products, as well as pants and shirts, with marks confusingly similar to plaintiff's.

This sequence of events is strong evidence of defendants' bad faith exploitation of plaintiff's good will. *Cf. E. & J. Gallo Winery v. Gallo Cattle Co.*, 955 F.2d 1327, 1341 (9th Cir.1992) (holding that trial court properly concluded that defendant intended to take advantage of the goodwill of plaintiff's mark when defendant knew that plaintiff would object to the use of the key word from plaintiff's well-known mark); *Centaur Communications*, 830 F.2d at 1228 (stating that

defendant's awareness of plaintiff's mark can give rise to an inference of bad faith). Moreover, defendants' price sheets offer its products as "Bear Line 95." (Cpt. Ex. G) By using only the general term "bear," defendants appear deliberately to have created ambiguity about the source of goods, most likely hoping that purchasers would presume that the source was the same as that of the more well known "bear" products sold by plaintiff, which are commonly referred to simply as "Bear" or "the Bear." (T. Hong Decl. Exs. 1–4; R. Hong Decl. Exs. 1–2)

The striking similarity in the colors and locations of the labels in defendants' parka, compared to plaintiff's, also reflects careful copying by defendants. (*Compare* PX 1 *with* PX 2) Defendants' addition to the shirt label of the term "U.S.A." and the frontal picture of a polar bear also reflect defendants' effort to mislead consumers into believing that Bear U.S.A. is the source of the product. (T. Hong Suppl. Decl. Ex. 2; PX 3) Moreover, defendants requested plaintiff's Italian boot manufacturer to manufacture boots "very similar" to the ones being made for plaintiff and asked one of Bear U.S.A.'s Korean parka manufacturers for the same model and specification provided to plaintiff. (R. Hong Decl. ¶¶ 15–16 & Ex. 2)

 Defendants' bad faith is not negated by the fact that they allegedly sought an opinion from counsel and conducted a trademark search. The Court recognizes that reliance on the advice of counsel and a search for competing trademarks may be a factor supporting a finding of good faith.

*Lang,* 949 F.2d at 583. In this case, however, the alleged opinion letter (Held Decl. Ex. D) can be described, at best, as superficial, containing no analysis explaining the conclusion reached and no documentation of search material supposedly supporting that conclusion. Defendants' only documentation of a trademark search was dated December 9, 1994 (*id.* Ex. E), more than a month after the alleged opinion letter. (*Id.* Ex. D) This tenuous evidence of advice of counsel, combined with evidence strongly indicating bad faith, undermines defendants' claim of good faith.[16]

In all the circumstances, the Court finds, for purposes of this motion, that defendants deliberately imitated plaintiff's Bear marks in an effort to trade on their goodwill with the expectation and hope that they would confuse consumers to their own profit. The variations in the marks, the so-called opinion of counsel and the trademark search were efforts to paper over the obvious.[17]

*(7) Quality of Defendants' Goods*

██ The seventh factor focuses on the quality of defendants' goods relative to plaintiff's. While more than one view exists as to the significance of differences in quality in ascertaining the likelihood of confusion, one accepted view is that a likelihood of confusion may result from a junior user selling an inferior product: the senior user's reputation suffers if consumers think that the source of the inferior product is the senior user. *Nikon,* 987 F.2d at 95; *Hasbro,* 858 F.2d at 78.

The record establishes, at least at this preliminary stage, that plaintiff's products promise and meet very high quality stan-

16. Nor is defendants' bad faith dispelled by a PTO examiner's action stating that "no similar registered or pending mark which would bar registration" has been found. (Held Decl. Ex. L) A fully registered mark establishes a rebuttable presumption of validity. *20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 747 F.2d 81, 88 n. 8 (2d Cir.1984). The examiner's action, taken in an *ex parte* context, does not rise to that level and, in any event, is overcome by the voluminous evidence of bad faith. *Cf. National Association of Blue Shield Plans v. Lovelace,* 435 F.Supp. 115, 116–117, 119 (N.D.Cal.1977) (defendants enjoined from using "Blue Care" because the term infringed plaintiff's mark "Blue Shield," notwithstanding the fact that a PTO examiner sent a letter to defendant stating that defendant's mark did not appear to cause confusion).

17. While by no means determinative in the conclusions reached here, the fact that defendants have been serial infringers, previously enjoined from infringing two other well-known brands (Pl. Mem. Ex. 1–2), strengthens further the appearance of bad faith. *Cf. Universal Motor Oils Co., Inc. v. Amoco Oil Co.,* 743 F.Supp. 1484, 1488 (D.Kan.1990) (stating that a previous infringer of plaintiff's mark has a greater duty to adopt a distinctive mark); *Cyclonaire Corp. v. United States Systems, Inc.* 209 U.S.P.Q. 310, 315, 1980 WL 30257 (D.Kan.1980) (defendants who changed their mark after plaintiff's protest of a confusingly similar earlier mark has a greater duty to adopt a distinctive mark).

dards. Plaintiff's products offer specific and detailed indications of quality, including high quality down fill and stitching in the jackets and parkas, as well as the use of high grade leather, waterproof Gore Tex® linings, and particular brands of insulation and soles in boots. (T. Hong Decl. ¶ 15; Cpt. Ex. B) [18] Comments from third parties and retailers confirm that plaintiff delivers on its promise of high quality. (T. Hong Decl. Ex. 7; Goldman Decl. 3, ¶ 6; Tsidorin Decl. 3, ¶ 7)

Defendants offered no comparable evidence about the quality of their products. The only basis for defendants' quality claims is a generalized assertion in its moving papers and Held's claim that Robert Hong complimented the quality of defendants' goods—a claim that Hong vigorously disputes and that the Court finds unworthy of belief. (Held Decl. ¶¶ 45, 47; Def.Mem. at 25; R. Hong Decl. ¶ 14) [19] None of the affidavits submitted by retailers of defendants' products vouched for the quality of defendants' goods, much less explained in any detail what aspects of defendants' goods reflect their high quality. (Sollazzo Decl.; Fuentes Decl.; Faour Decl.) Moreover, both of the Hongs and at least one retailer who carries plaintiff's products expressed the opinion that the defendants' products are of inferior quality. (T. Hong Decl. ¶ 29; R. Hong Decl. ¶ 14; Tsidorin Decl. ¶ 10) The weight of this evidence favors the conclusion that defendants' products reflect quality inferior to plaintiff's and this heightens the likelihood of confusion. [20]

### (8) Sophistication of Relevant Consumer Groups

The relevant consumers are fashion and name-brand conscious. Defendants argue that consumers therefore are more likely to be aware of differences in the marks and not confuse the source of the products. On the other hand, the very fact that consumers seek a particular name could increase confusion if they are simply searching for the name "bear." Overall, this factor does not weigh heavily in either party's favor.

\* \* \*

The defendants' bad faith gives rise to a presumption of likelihood of confusion. See, e.g., Paddington Corp. v. Attiki Importers and Distributors, 996 F.2d 577, 586 (2d Cir. 1993); Warner Bros. Inc. v. American Broadcasting Cos., 720 F.2d 231, 246–47 (2d Cir.1983). But the Court does not rely on that presumption alone where, as here, the sum of the Polaroid factors points so strongly in plaintiff's favor. Plaintiff has shown a strong likelihood of success. At a minimum, plaintiff has demonstrated serious questions going to the merits.

### The Balance of the Equities

■ The finding of a likelihood of success on the merits makes consideration of the balance of the equities unnecessary. In any

---

18. The hang tags on one of plaintiff's down parkas certifies that it is made from "goose down" in a composition "90/10." A rectangular booklet also attached to the zipper contains detailed explanation and illustration of the type of down filling and special stitching. (PX 2)

19. An inspection of one exhibit and several photographs of defendants' products and customer outreach material reveal only a few instances where any claim of quality is made prominently. The labels on two kinds of down jackets state that they are "Certified" to be "Down Quality," made from "Duck Down" and "Composition" "80/20." (Held Supp. Decl. Ex. HH; PX 1) In lieu of the rectangular booklet describing the quality of stitching and down in plaintiff's down parka, defendants' parka offers a rectangular booklet entitled "The Down Story" with cleaning instructions and a duck recipe. (PX 1) The tag to a pair of defendants' boots states that it is "100% waterproof ... with years of quality and satisfaction." Robert Hong doubts that defendants' boots are waterproof (R. Hong Decl. ¶ 14) and, in any event, defendants' claims of offering "years" of quality and satisfaction on that product is specious, as the boots have not been manufactured for even a year.

20. Some courts have viewed a "great disparity" in price and "marked difference" in quality as lessening the likelihood of consumers' misapprehending the source of either product. Charles of the Ritz Group, Ltd. v. Quality King Distributors, Inc., 832 F.2d 1317, 1323 (2d Cir.1987). Here, the lower quality of defendants' products requires close inspection to discern, and consumers may not look closely if they already associate the name "Bear" with quality. And, although defendants assert that their prices are lower, a glance at the price list does not indicate that the prices are so low as to scream "bargain" and alert consumers that the products come from a different source than plaintiff's well-known, quality "bear" products. (See Cpt. Ex. G)

case, however, that balance tips decidedly in plaintiff's favor, particularly with respect to boots and parkas, its present products.

If an injunction were denied erroneously,[21] plaintiff's Bear line, which has become the heart of its business since 1993, would suffer. Plaintiff has invested tens of thousands of dollars building goodwill for its Bear marks. In addition to losing sales unfairly to defendants, plaintiff's reputation for high quality products would suffer to the extent that consumers confuse plaintiff as the source of defendants' products and conclude that the quality of defendants' products is inferior.

The impact of an injunction, even a wrongful injunction, on defendants would be substantially less. First, at least twenty percent of defendants' business consists of products sold under other names and would be entirely unaffected. Second, any potential loss on goods now on order or in transit could be limited substantially by relabelling, which Held conceded was possible as to at least some of the goods, or selling them abroad.[22] *See generally Golden Gulf v. Jordache Inc.,* 896 F.Supp. 337 (S.D.N.Y.1995). Finally, in view of the fact that defendants' jeans and shirts have been on the market much longer than the parkas and boots, the bulk of defendants' sales no doubt are in the former category; in consequence, limitation of an injunction to the protection of plaintiff's outerwear would further mitigate any injury to the defendants if an injunction were issued wrongfully.

In view of these considerations, the Court concludes that the balance of the equities tips heavily in plaintiff's favor, particularly if an injunction left defendants' jeans and shirt business intact pending a prompt trial.

*Irreparable Harm*

 As noted above, the Court's finding of likelihood of confusion gives rise to a presumption of irreparable injury. Quite apart from the presumption, the Court finds that the plaintiff is threatened with irreparable injury because the calculation of damages would be extremely difficult and the loss of sales not readily quantifiable and also because plaintiff is threatened with irremediable damage to its good will in consequence of the comparatively poor quality of defendants' goods. *See Omega Importing Corp. v. Petri–Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir.1971) (describing how an infringing product that is poorer in quality or simply not worth the price can create "lasting but not readily measurable injury" to plaintiff's reputation); *see also* 4 McCarthy on Trademarks ¶¶ 30.18[4], at 30–75, 30.18[2], at 30–71. The question then becomes whether plaintiff has delayed in seeking a preliminary injunction in a manner that undercuts the threat of irreparable harm, as defendants contend.

 In *Citibank N.A.,* 756 F.2d 273, the Second Circuit reversed the grant of a preliminary injunction, ruling that the presumption of irreparable harm may be "neutralized" where the plaintiff does not promptly seek a preliminary injunction.[23] *Id.* at 276–77. The scope of *Citibank,* however, has not yet been fully established. While unexplained delay in seeking a preliminary injunction *may* defeat the presumption of irreparable injury, delay attributable to good faith investigation or a failure to realize the severity of the infringement does not. *Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 968 (2d Cir.1995); *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 39–40 (2d Cir.1995) (delay of four months from the time she first heard of defendant's possibly infringing activity and three weeks after learning definitively of an objectionable act by defendant was not un-

---

**21.** In balancing the equities, the inquiry includes consideration of whether plaintiff would suffer greater harm from an erroneous denial of the injunction than the defendants would suffer from an erroneous grant. *See Buffalo Forge Co. v. Ampco–Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir.1981); *Foulke v. Foulke,* 896 F.Supp. 158, 162 (S.D.N.Y.1995); *Holford USA Ltd. v. Cherokee, Inc.,* 864 F.Supp. 364, 374 (S.D.N.Y.1994).

**22.** Plaintiff has indicated that it does not object to defendants selling allegedly infringing inventory outside the United States except in Japan.

**23.** The effect of delay short of laches applies only at the preliminary injunction stage. *E.g., Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 968 (2d Cir.1995); *Majorica, S.A. v. R.H. Macy & Co.,* 762 F.2d 7, 8 (2d Cir.1985); *Citibank, N.A.,* 756 F.2d at 276.

reasonable delay); *Fisher–Price Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 125 (2d Cir.1994) (delay not unreasonable where plaintiff searched unsuccessfully for five months after hearing a rumor of defendants' infringing products and sought injunction less than two weeks after finding and examining the product); *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir.1992) (author's eight-month delay in filing claim did not rebut presumption of irreparable harm because he spent that time trying to obtain a copy of the infringing screenplay and movie); *Clifford Ross Co. v. Nelvana, Ltd.*, 710 F.Supp. 517, 521 (S.D.N.Y.1989), *aff'd without opinion*, 883 F.2d 1022 (2d Cir.1989) (seven month delay in filing did not rebut presumption of irreparable harm because plaintiff was not aware of the true extent of the severity of the infringement and the intervening period involved constructive effort to resolve the dispute without litigation).[24] Moreover, the Court of Appeals has not held that even unexplained delay necessarily defeats a preliminary injunction motion, particularly in the face of District Court findings of irreparable injury. *See Tough Traveler, Ltd.*, 60 F.3d at 969 (Jacobs, J., concurring).

There is no need here to consider the limits of the *Citibank* case. The Court has found a threat of irreparable injury independent of the presumption. In any case, the Court finds no unreasonable delay in seeking injunctive relief with respect to defendants' sale of boots, down jackets, and light jackets. Plaintiff was not aware of these products or, at any rate, of the severity of plaintiff's activities until mid-September at the earliest.

■ Plaintiff's slow response in seeking relief with respect to defendants' production of jeans and shirts, particularly taken together with plaintiff's lack of existing competition in that area, on the other hand, does undercut the need for and urgency of a preliminary injunction. Because plaintiff was fully aware of the jeans for nearly four months and of

the shirts for approximately three months before seeking this preliminary injunction, the delay is not explained by the need for further investigation. Despite the finding that defendants' pants and shirts are likely to cause confusion, plaintiff's lack of diligence militates against enjoining defendants from selling those items pending a prompt trial. *Cf. Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F.Supp. 976, 981 (S.D.N.Y. 1989) (finding that plaintiff's three month delay in seeking preliminary injunction since the last settlement communication with defendant negated the presumption of irreparable harm). In all the circumstances, the Court declines to do so, although defendants obviously proceed at their own risk.

### Conclusion

Plaintiff's motion for a preliminary injunction is granted in part and denied in part. Accordingly:

1. Defendants, their officers, agents, servants, employees, and attorneys and all persons in active concert and participation with them who receive actual notice of this order, by personal service or otherwise, are enjoined and restrained, pending the hearing and determination of this action, from using, selling, advertising, or offering for sale in the United States and Japan products (other than shirts and denim jeans) carrying colorable imitations of plaintiff's "BEAR," "BEAR and logo" and "BEAR U.S.A. and logo" trademarks, including without limitation defendants' "Bear," "Bear Jeans" and "Bear–Tex" trademarks, or any combination thereof.

2. This preliminary injunction shall be effective immediately. It shall expire at 11:59 p.m. on December 1, 1995 unless plaintiff by that time shall have posted bond or given other security satisfactory to the Court, pursuant to Rule 65(c), in the amount of $100,-000.[25]

---

24. These interpretations of *Citibank* are supported by sound policy considerations—"parties should not be encouraged to sue before a practical need to so has been clearly demonstrated." *Playboy Enters. v. Chuckleberry Publishing*, 486 F.Supp. 414, 415 (S.D.N.Y.1980).

25. The defendants requested a bond in an amount exceeding $4.9 million. (Held Supp. Decl. ¶¶ 29–42) The request manifestly is wildly exaggerated, particularly considered against the limited scope of the injunction. Moreover, as noted, Held conceded at the evidentiary hearing that at least some of his incoming goods could be

3. The parties are directed to complete discovery by December 29, 1995 and to file a joint pretrial order in the form prescribed by the individual rules of the undersigned on or before January 5, 1996. The Court intends to reach the case for trial as promptly as possible.

The foregoing constitutes the Court's findings of facts and conclusions of law.

SO ORDERED.

relabeled (Tr. 130–31), and it is likely that even those that cannot may be sold abroad. *See generally Golden Gulf v. Jordache Inc.*, 896 F.Supp. 337 (S.D.N.Y.1995). In view of defendants' failure to produce any credible evidence as to the quantum of injury that realistically might be expected to sustain in the event the injunction is wrongfully issued, the Court has fixed $100,000 as its best estimate given an insufficient record.